EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
MICHELE J. SWANSON, State Bar No. 191193
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5703
 Fax:  (415) 703-1234
 Email:  Michele.Swanson@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DANIEL MOORING,** | C 07-5013 SI (pr) |
| Petitioner, | |
| v. | |
| **J. WALKER, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MICHELE J. SWANSON, State Bar No. 191193
Deputy Attorney General
6 |  455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 |  Telephone:  (415) 703-5703
Fax:  (415) 703-1234
8 |  Email:  Michele.Swanson@doj.ca.gov

9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13

**DANIEL MOORING,**                                      C 07-5013 SI (pr)

14

Petitioner,                 **MEMORANDUM OF POINTS
15                                                        AND AUTHORITIES IN
v.                          SUPPORT OF ANSWER TO
16                                                        PETITION FOR WRIT OF
**J. WALKER, Warden,**                                   **HABEAS CORPUS**
17

Respondent.
18

19

20 | **STATEMENT OF THE CASE**

21 |         In 2004, a San Francisco County jury found petitioner guilty of first degree murder with

22 | a robbery special circumstance, two counts of second degree robbery, assault with a deadly weapon,

23 | and possession of a firearm by a felon. Exh. 2C at 826-833; Exh. 4BB at 3403-3407.  The trial court

24 | sentenced petitioner to life without the possibility of parole on the murder count, five-year upper

25 | terms for each of the two robbery counts, a four-year upper term on the assault count, and an eight-

26 | month middle term on the possession count.  The sentence on one of the robbery counts and the

27 | assault count were stayed.  Exh. 2C at 896-900; Exh. 4EE at 3456-3459.

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

1     The California Court of Appeal affirmed the judgment on October 3, 2005.  Exh. 9.

2  Petitioner filed a petition for review in the California Supreme Court, which was denied on January

3  4, 2006.  Exhs. 10, 11.

4     Petitioner next filed a series of habeas petitions in the state superior court, court of appeal,

5  and supreme court, which were pending from November 9, 2006 to September 12, 2007.  Exhs. 12-

6  14; Petition at 4-5.

7     Petitioner filed the instant federal habeas petition on September 27, 2007.  On November

8  14, 2007, this Court ordered respondent to show cause why the petition should not be granted.  The

9  following is our response.

10                              **STATEMENT OF FACTS**

11     The following facts and accompanying footnotes are taken from the opinion of the

12  California Court of Appeal:

13          A. PROSECUTION CASE AGAINST MOORING

14          1. Robbery of LaBonte

15     Victim [Ray] LaBonte left his apartment in San Francisco around 10:00
    p.m. on May 25, 1999, carrying $8 in cash.  As he walked towards Alhambra
16   Street, he saw a black male in dark clothing and a hooded sweatshirt run
    towards him, while another man circled around him.  The man running towards
17   him opened his jacket and displayed a single barrel gun.  The other man, also
    in dark clothes, was taller, thinner, and bare-headed.   The armed man
18   (purportedly [Daniel] Mooring) instructed LaBonte to get down; LaBonte
    dropped to his knees.  He then ordered LaBonte to give him his money, and
19   LaBonte tossed the $8 from his pocket onto the sidewalk.  Both assailants
    demanded LaBonte's wallet, but LaBonte replied he did not have one.  LaBonte
20   felt someone check his back pocket, and then felt a blow to the back of his head.
    As he fell forward, the armed man struck him in the right side of his jaw with
21   the gun, and he lost consciousness.  LaBonte's jaw was fractured in several
    places (requiring his jaw to be wired shut for six weeks and a permanent metal
22   plate to be inserted), he suffered multiple cuts around his ear (requiring plastic
    surgery), and one of his teeth was knocked out.
23
       At trial, LaBonte identified Mooring as one of the men who robbed him,
24   although he testified that he had looked at the ground during most of the
    robbery,  and  he had failed to identify a photograph of Mooring in a
25   photographic lineup and identified photographs of others as the assailant as
    well.   LaBonte told police his attacker was about 5'10" tall with a medium
26
27
28

build, and described the second person as taller. Mooring was 6'2" or 6'3" tall.[1]/

[Willie] Kennedy and [Santese] Edwards, Mooring's accomplices, both testified that Mooring and Edwards were the ones who robbed LaBonte. According to Kennedy, he and [Tremayne] Collier left Richmond on May 25, 1999, in Collier's red Mustang convertible. At some point they were joined by Mooring and picked up Edwards in San Francisco. Kennedy had brought along his sawed-off .22 rifle. Collier and Edwards wore black "puff" jackets, while Mooring wore a gray and black Timberland jacket (exhibit 46). They discussed a plan to commit a robbery and drove to the Marina District. When they spotted a man (LaBonte) walking alone, someone other than Kennedy said, "let's ... get him." Mooring and Edwards got out of the car and robbed LaBonte, while Collier and Kennedy drove around the block. When Mooring and Edwards returned to the car, Mooring had the rifle and they mentioned they got a few dollars from their victim. Edwards asked Mooring why he hit LaBonte, and Mooring replied, "a bullet fell out."

Edwards testified to the same effect. He recalled that Mooring, Collier, and Kennedy picked him up in San Francisco. Edwards was wearing his black puff jacket. Kennedy, who was holding the sawed-off rifle, said they wanted to get some money, which Edwards understood to mean they wanted to commit a robbery. The foursome eventually drove towards the Marina District. Edwards spotted someone (LaBonte) and announced, "They go somebody right there." Edwards (who was driving) turned the corner and parked. Edwards and Mooring, now holding the rifle, got out of the car, and Edwards told Collier and Kennedy to drive around the corner and return in two minutes. Mooring approached LaBonte from the front, while Edwards approached from the back. Mooring pointed the gun at LaBonte, and LaBonte put his hands in the air. Edwards patted LaBonte down and took his money. Mooring hit LaBonte with the rifle, and Edwards heard something fall to the sidewalk. Edwards and Mooring ran back around the corner, waited about a minute for the car to return, got in, and then proceeded with Kennedy and Collier to 4th and Mission Streets. Edwards recalled asking Mooring why he hit LaBonte so hard, but he could not remember if Mooring answered.

Officer David Garcia responded to the scene around 10:20 p.m. and found a bullet without a casing or jacket. Retired San Francisco Police Department Criminalist Terry Coddington testified that the unfired bullet without a casing could have been expelled from a Marlin rifle if the rifle was used as a club.

2. Homicide of Worcester

a. *Testimony of Worcester's Friend, Farley*

Christopher Farley and [Shayne] Worcester, who was visiting San Francisco, had dinner with a group of friends, went to a bar in the Marina District, and left around 11:30 p.m. or midnight. They walked towards Farley's apartment on Russian Hill. Near the corner of Hyde and Vallejo Streets, Farley

---

1.     LaBonte's description of his primary assailant actually fit Kennedy, who testified he was 5'10" tall and weighed 175 or 180 pounds in May 1999.

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
C 07-5013 SI (pr)

3

noticed two black men dressed in dark clothing, standing against a building as he and Worcester walked by. Shortly after Worcester and Farley crossed Hyde Street, the men began yelling and running towards them. The taller of the assailants had his arm stretched straight out from the shoulder, but Farley did not see him holding anything. Farley ran. When he looked back, Farley saw Worcester face down on the ground over the curb, with his lower body on the sidewalk and his upper body on the street. The two assailants stood over him. One of them said something like, "I want your money," and Worcester replied to the effect of "It's in my pocket. Take it." One or both of the assailants went through Worcester's pockets and appeared to pull out Worcester's wallet. Farley saw the arm of one of the assailants rise up within a few feet of Worcester's upper body, and then heard two or three popping sounds. The robbers ran off. Farley ran to Worcester and saw he was covered in blood. Paramedics took Worcester to the hospital, where he died the next morning of multiple gunshot wounds. Three slugs were recovered from his body. The cause of Worcester's death was two bullet wounds in his brain; a third bullet wounded his left shoulder.

Farley did not see the assailants' faces and did not identify Mooring in court. Although the two men were big, he noted, neither appeared as large as Mooring in court. To Farley's recollection, the jacket Mooring was wearing in a photograph (exhibit 46)—the gray and black Timberland jacket Kennedy claimed Mooring was wearing that night—was not the jacket the shooter was wearing.

### b. *Other Percipient Witness Testimony*

Christopher Jung heard two bangs a little after midnight. Twenty seconds later he saw a maroon and white convertible double-parked on Hyde Street and a tall and gangly man with short cropped hair and a black sweat suit (purportedly matching the description of Edwards) standing near the car looking east up Vallejo Street. After a long time, the man got in the passenger side of the car and the car slowly moved away. Jung then saw someone else coming around the corner. Jung called 911 and heard sirens.

Kristen Grant heard two male voices outside her home on Vallejo Street around 12:15 a.m. that night. One said, "you better run, motherfucker." After a noise like a struggle, she heard someone demand, "give me your wallet." Within seconds she heard three shots. When she looked outside, she observed a man (Worcester) lying face down. Another man (Farley) stood over him and asked her, "please call 911."

### c. *Testimony of Accomplice Kennedy*

After the LaBonte robbery, Kennedy recalled, Collier drove them around San Francisco and they discussed robbing somebody else. When they spotted two men walking on the street, Collier and Mooring jumped out of the car. Mooring had the gun. Edwards drove around for three or four minutes and returned to the same spot and waited. Kennedy heard three gunshots and recognized the sound of his gun. Mooring and Collier then came running back to the car. Inside the car, Collier asked Mooring why he shot him, and Mooring said "I don't know." Collier said he had the man pinned down with his foot on his neck.

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
C 07-5013 SI (pr)

4

As they drove toward Edwards's grandmother's house, one of them was going through a wallet and dumping its contents out of the car.[2] They stopped at a gas station, where Collier used a credit card (Worcester's) to purchase gas. As they waited for Edwards to pump the gas, Kennedy remarked that it was "stupid" to shoot Worcester. The four men proceeded to Edwards's grandmother's house, where they dropped Edwards off. Mooring, Kennedy, and Collier continued on to a Denny's restaurant in Emeryville, where Collier used Worcester's credit card to treat them and some acquaintances to meals.

Kennedy and Mooring wound up at Kennedy's home in Richmond, while Collier went to his own house. Mooring watched television with Kennedy's mother, Renee Williams. When news of the Worcester killing came on, Kennedy's mother said, "That was y'all." Mooring eventually admitted, "I did it; yeah, I did it." He added, "your son [Kennedy] didn't have nothing to do with it." Later that day (May 26), Collier and Kennedy went to a department store in Marin where they tried to use Worcester's credit card. (Bank and credit card records indicated that Worcester's credit card had been used at various locations after the robbery.)

d. *Testimony of Accomplice Edwards*

Edwards, like Williams, testified that Collier and Mooring were the ones who attacked Worcester and Farley. Edwards explained that, after the LaBonte robbery, Edwards drove up to Russian Hill where he saw two young men coming down the street. Edwards said, "there go some people right there." He drove past them and stopped the car. Collier and Mooring got out. After a minute or so, Edwards heard a couple of "pops"; then Mooring and Collier ran fast to the car and got in. Edwards asked what they did, but neither man responded. As Edwards drove to a gas station, Kennedy was going through a wallet and throwing things out the window. Collier paid for the gas with a credit card. Edwards then drove to his home on Laguna and Golden Gate Avenues in San Francisco. As the other three dropped him off, Edwards told them, "Get rid of the gun."

About a month later, Edwards testified, he saw Mooring and asked him what had happened that night. Mooring responded, "it was an accident."

e. *Testimony of Kennedy's Mother*

Kennedy's mother Renee Williams testified that Mooring was at her home on the afternoon of May 26, 1999. She and Mooring were watching the news report of the killing. Williams told Mooring, "it sounded like your MO," and Mooring said "huh-uh." She switched to another channel with the same news and something about the car, and she remarked, "that sounds like y'all." She asked Mooring, "was that you?" and he said something like "yeah" or "yeah, I did it," which she took to mean that he killed the man. Williams remembered that Kennedy was out of the house with Collier at the time of the incident.

2.    Worcester's driver's license and other cards were found on Lombard Street on May 26. Four business cards were found as well.

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus

Mooring v. Walker
C 07-5013 SI (pr)

5

f. *Testimony of Bateast*

LaShonta Bateast lived with Mooring's cousin, Antoine Johnson, and had known Mooring for 11 years. Around the end of May 1999, Mooring and another man were in Bateast's living room when news about victimized tourists was on television. Mooring referred to the robbery and said, "Me and my home boy did the robbery, did the stuff to the tourists." When she asked why he robbed them, he replied, "I did it because I needed the money." Mooring explained that he shot the tourists with a gun he had bought from someone.[3] The other man in Bateast's living room was laughing, as if it were a joke, and Bateast thought Mooring was "playing around."

The police talked to Bateast in May 2000, but she did not tell the police about her conversation with Mooring. She revealed the information to the police later that month, after they said they could help get her brother out of custody if she helped them. On cross-examination, Bateast admitted that, as she had told the police, Mooring claimed he killed the tourist "by the pier," not on a hill.

3. <u>Police Investigation</u>

On October 5, 1999, a black Old Navy jacket (exhibit 42-A) was seized from Collier's bedroom. Unique gunshot residue particles were found on both sleeves of his jacket. Particles consistent with gunshot residue were also found on the "Edwards jacket" (exhibit 70).

Mooring was interviewed by the police on November 22, 1999, and a videotape of the interrogation was played for the jury. When asked what he was doing in May 1999, Mooring said he would hang out everyday with his cousin in San Francisco. When asked if he remembered being in "this car" (while being shown a photograph presumably of Collier's Mustang), Mooring claimed he had ridden in it and it belonged to someone his friend "Tese" knew. When the police said they wanted to know if Mooring was directly involved in "robberies, murder, things like that," Mooring responded that he did not "get down like that."

Also on November 22, 1999, police searched the home of Kennedy's aunt, with whom Kennedy was living. Two days later, Kennedy spoke with Marin County Detective Ridgeway as well as the San Francisco police. Although he initially denied it at trial, Kennedy told Detective Ridgeway that Collier

3.      Bateast's testimony was as follows: "Q. When Mr. Mooring described, as you said, that he did it, did he tell you how he did it? [¶] A. He shot him. [¶] Q. Mr. Mooring told you that day in May that he shot the tourists? [¶] A. Yeah. [¶] Q. Did he tell you with what? [¶] A. Don't everybody know what you shoot someone with? [¶] Q. But we need to know what Mr. Mooring told [you that] day, Ms. Bateast. Even if it seems obvious to you, we need to know what he told you that day. [¶] A. With a gun. [¶] Q. Did you ask Mr. Mooring any questions about where he got that gun? [¶] A. Somebody sold it to him. [¶] Q. Is that what Mr. Mooring told you? [¶] A. Yes."

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus                    Mooring v. Walker
C 07-5013 SI (pr)

6

admitted shooting Worcester, saying he pulled his foot off of Worcester and shot him.

Mooring was interrogated by police again on December 3, 1999, and a videotape of this interrogation was played to the jury as well.  Mooring initially denied robbing or shooting anyone, insisted he had done nothing, and claimed he was not at the crime scene.  Later in the interview, however, he conceded being at the scene: "If I wasn't there, you wouldn't be talkin' to me right now."  Further, he asserted: "Even if I was there, I had no part of doin' this," "I was in the wrong place at the wrong time," and if he explained what happened he would be "incriminating [him]self."[4]

Edwards was interviewed by police on December 6, 1999.  He denied any knowledge or involvement in the case.  He admitted knowing Mooring, but denied knowing Collier or Kennedy, until the police confronted him with a photograph of him and Kennedy seized from Edwards's home.  Edwards also falsely claimed he did not recognize Collier's car or know anyone who had such a car.  His strategy, he testified, was to see where the police were going and deny any knowledge or involvement by lying.  He lied to the police because he did not want to go to jail.

4. Grand Jury Proceedings and Pleas of Accomplices

On April 16, 2001, Kennedy pled guilty to the offense of accessory after the fact.  He faced a maximum term of three years, but was given a suspended sentence on the condition of having already served one day in jail, was placed on three years probation, and was released.  On April 17, Kennedy testified before the grand jury.[5]

---

4.      This portion of the interview went as follows: "Q-1. Well, we got you there [at the scene of Worcester's murder] anyway. [¶] A. I wasn't no part of it. [¶] Q-1. You can't say you weren't any part of it. You were certainly there. [¶] A. Even if I was there, I had no part of doin' this. [¶] Q-1. Then what's your explanation of what happened? [¶] A. I don't know. [¶] Q-2. Well, explain why you're there. [¶] Q-1. You tell us how you got there. [¶] Q-2. Were you out lookin' for an ice cream cone that night? (Inaudible). [¶] A. Wrong place, wrong time. [¶] Q-1. Yes. Very clearly. So what happened? [¶] A. I don't know what happened. I was in the wrong place at the wrong time. [¶] Q-1. Yes. So what happened? No games, just what happened. We'll put the picture together later. We'll ask them, 'Okay, listen, is this what happened or not?' Can you just tell us that? [¶] A. I'd be incriminating myself if I did, so—"

5.      Kennedy's disposition was conditioned on him testifying truthfully for the prosecution and obeying all laws.  By his own admission he did not always tell the truth in the grand jury proceedings.  Nor did Kennedy comply with the other condition of probation, as in January 2003 he participated in multiple counts of home invasion robbery.

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus

Mooring v. Walker
C 07-5013 SI (pr)

7

1

2          Later that month, the grand jury indicted Mooring, Collier, and Edwards.
       Edwards was arrested on the indictment on April 24, 2001.  Two days later,
3      Mooring voluntarily surrendered himself.  As he was transported to jail,
       Mooring observed, "Three people [including Collier] have been arrested. Where
       is the other guy?"

4          Early in 2002, when both Edwards and Collier were in custody, Collier
5      gave Edwards a letter.  The letter purported to describe in detail the events of
       May 25 and 26, explaining that neither Collier nor Edwards had done anything
6      wrong and only Kennedy and Mooring even knew there was a gun in the car.
       According to the letter, Mooring was directing the events that night.  The letter
7      accordingly predicted that Edwards and Collier should receive not guilty
       verdicts.  Edwards passed this letter on to his attorney.  At trial, Edwards
8      conceded the letter was a "scam" to try to obtain an acquittal.

9          In April 2002, Edwards was interviewed by a defense investigator with a
       series of questions prepared by the district attorney; the answers were to be a
10     proffer of Edwards's testimony for the prosecution.  In answering the questions,
       Edwards knew that his testimony had to comport with Kennedy's in order to be
11     of value to the prosecution.  On some points his proffer was untruthful.

12         In June 2002, Edwards signed a plea agreement, by which he would plead
       guilty to felony grand theft with the understanding that he would serve no more
13     than four years.  Edwards further understood that after his testimony in this
       case, the charges would be dropped and he would be granted probation,
14     although his maximum exposure in the case was life without possibility of
       parole.[6]

15         5. Ballistics

16         The unfired bullet without a casing, found at the LaBonte scene, was
       determined to be similar to the expended bullets recovered from the Worcester
17     autopsy.  The rifling marks on the fatal bullets matched the unique rifling
       characteristics of a Marlin firearm.

18         B. DEFENSE CASE

19         Dr. John Thornton, a forensic scientist, testified that the .22 long
20     ammunition used in the .22 sawed-off rifle was very common, with over three
       billion rounds a year manufactured.  It was highly unlikely, he opined, that a
21     bullet would fall out of a Marlin rifle, particularly a bullet without a casing like
       the one found at the LaBonte scene, since it is "devilishly hard" to remove a
22     bullet from its casing and the necessary force would leave marks on the bullet.
       Dr. Thornton could not explain the uncased bullet.

23         The defense presented evidence that Kennedy had perpetrated a home
24     invasion robbery in January 2003.  Christopher Anderson testified that he was

25     _____

26     6.    Kennedy entered the Witness Protection Program in April 2001.
              Bateast was brought into the program eight days after her grand jury
27            testimony.  Kennedy's friend, Kennedy's mother, and Edwards also
              received benefits from the program.
28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                                      C 07-5013 SI (pr)

8

1   awakened at 4:00 a.m. by someone waving a gun in his face.  He saw his friend
    being held on the ground by another man with a gun demanding their wallets.
2   Either two or three of the assailants had guns and were threatening to shoot
    them if they did not give up everything they had.  Anderson lost his watch, the
3   apartment was ransacked, and Play Station 2 and video games were stolen.  All
    three victims made positive identifications of the suspects, including Kennedy,
4   who were stopped leaving the scene.  Kennedy was wearing a dark puff jacket.

5       The defense also presented evidence that Collier was involved in a crime
    less than a month after the incident.  Frank Caiazzo testified that in the early
6   morning of June 17, 1999, he intended to buy drugs from three men, who took
    him to an ATM to withdraw $100.  After withdrawing the money, Caiazzo was
7   struck in the face with a gun and was held down by a man's foot.  He held up
    the money and said to take it.  Caiazzo called police and later identified Collier
8   as the gunman and driver.  Collier admitted in a parole revocation hearing that
    the ATM photographs were of him, but claimed the object he was holding was
9   not a gun but an ax handle.[7/]

10      Evidence was presented as well that Williams (Kennedy's mother) was
    investigated on suspicion of selling cocaine out of her residence, and that an
11  informant had made a controlled buy of drugs from her.

12  Exh. 9 at 2-12.

13  **ARGUMENT**

14  **I.**

15  **STANDARD OF REVIEW GOVERNING FEDERAL HABEAS
    PETITIONS BROUGHT BY STATE PRISONERS**
16
17  This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

18  (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and

19  "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

20  U.S. 19, 24 (2002) (per curiam).  Under the AEDPA, the federal court has no authority to grant

21  habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application

22  of," clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes

23  an unreasonable application of Supreme Court law only if the state court's application of law to the

24  facts is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75

25  (2003). Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should
26

27      7.    Dr. Thornton opined that the object held by Collier in the ATM
             photograph was consistent with a sawed-off rifle.
28
    Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                           C 07-5013 SI (pr)

9

1  the court grant relief. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting

2  *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005)). The petitioner bears the burden of showing that the

3  state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

4

## II.

5

6  **THE ADMISSION OF EVIDENCE OF A SUBSEQUENT ROBBERY COMMITTED BY PETITIONER AND HIS STATEMENT TO THE POLICE AFTERWARD DID NOT VIOLATE DUE PROCESS**

7

8       Petitioner contends that the trial court violated his right to due process and a fair trial by

9  admitting evidence of his involvement in a robbery occurring after the crimes in this case, along with

10 a statement he made to the police after that robbery. However, because the evidence of the robbery

11 was probative of petitioner's intent to kill, its admission did not violate due process. Moreover,

12 assuming petitioner's statement to the police that he did not care about people who were not his

13 "folks" was not clearly probative of his intent to kill, its admission was not prejudicial.

14    **A.    Trial Court Proceedings**

15       The prosecution moved to admit evidence that on April 16, 2000, petitioner and two other

16 men chased down, beat, and robbed Ledia McCready in San Francisco. The prosecutor argued that

17 the evidence was admissible under California Evidence Code section 1101, subdivision (b), to show

18 petitioner's "modus operandi and . . . depraved intent." He also argued that "[i]f the jury does not

19 learn the truth about Mooring, the jury will be misled to believe that only Kennedy and Collier ha[d]

20 committed similar actions and, by extension, only Kennedy and Collier had the cold, heartless intent

21 needed to commit the crimes." Exh. 2B at 406-408.

22       Four months later, the prosecutor filed a supplemental motion arguing that, pursuant to

23 *People v. Steele*, 27 Cal. 4th 1230 (2002), the evidence was admissible to show the killing was not

24 an accident and petitioner acted with premeditation and deliberation. Citing *Steele*, the prosecutor

25 argued that "'[t]he least degree of similarity between the crimes is needed to prove intent.'" *See id.*

26 at 1244. He noted that in both the McCready incident and the Worcester murder, petitioner chased

27 the victim with an accomplice, knocked the victim to the ground, beat the victim, and robbed the

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

victim.  The prosecutor argued that the McCready incident was admissible because it was not only similar to the crime charged, but it occurred close in time to the charged crime.  He also argued that the evidence had a reduced risk of prejudice because McCready was not killed and the crime was confirmed by petitioner's guilty plea.  Exh. 2B at 475-479.

Petitioner filed an opposition, arguing that the crimes were not sufficiently similar to show modus operandi.  He argued that the evidence was cumulative because intent could be inferred from the act itself.  Moreover, he argued that any probative value was outweighed by its prejudicial effect.  Exh. 2B at 480-484.

The trial court held a hearing on the matter.  Defense counsel argued that the prosecution was trying to introduce propensity evidence.  In particular, he focused on petitioner's statements to police: petitioner claimed he did not participate in the McCready robbery (despite his plea to assault with force likely to cause great bodily injury); he said he did not get involved in other people's business; he merely stood by while McCready was assaulted; and he repeatedly said he "did not give a fuck" whether strangers were attacked.  Exh. 3D at 154-155; *see* Exh. 5 (People's Exh. 112-A). Defense counsel argued that *Steele* was distinguishable because the crimes in the present matter were less similar.  Defense counsel also argued that the evidence was cumulative.  Exh. 3D at 156-161.

The prosecutor argued that since petitioner would not concede that the murder was deliberate or premeditated, and there would be evidence that petitioner claimed the shooting was accidental, it could not rely on petitioner's conduct to prove intent.  Therefore, the evidence was not cumulative and was necessary to prove intent.  Exh. 3D at 161.

The trial court indicated that it had reviewed *Steele*, as well as some other cases.  Exh. 3D at 165.  The court then stated:

> It does appear here that we are talking about an intent, an analysis regarding intent, not regarding identity, and the facts of intent to kill or premeditation or deliberation are all at issue in this case . . . .

> The Court also looks at the doctrine of chances, which is . . . referred to in the *Steel[e]* case, the doctrine that the more often one does something, the more likely that something was intended and even premeditated, rather than accidental or spontaneous."  Exh. 3D at 166.  "It is not on exactly all fours in

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

11

1
2
3

> the facts with this case, but the Court does find that the probative value of that
> case occurring this close in time with that collection of common factors, that the
> probative value of that case is greater than the prejudicial value of allowing in
> that evidence, and so the Court is going to allow in the evidence regarding the
> Ledia McCready assault . . . .

4  Exh. 3D at 167.

5      Two weeks later, the prosecutor sought guidance from the trial court regarding how much

6  evidence he could introduce regarding the McCready incident.  Exh. 3H at 364.  Defense counsel

7  argued that there was evidence that petitioner did not participate in the assault—only in searching

8  McCready's pockets.  He also argued that there was no logical connection between petitioner saying

9  he did not care about strangers and having the intent to shoot Worcester.  Exh. 3H at 366-369.

10     The prosecutor argued that petitioner's statement that he "did not give a fuck about

11  strangers" was:

12
13
14

> [P]retty good evidence of his intent, his intent at that event itself and as it
> relates to the question:  Was the killing of Mr. Worcester, a total stranger to
> him, an accident?  "Sorry, didn't mean to kill you," total stranger on the ground,
> or "I intend to kill you, total stranger on the ground, because I don't care about
> your life.  You mean nothing to me because I don't know you."

15
16
17
18

> This was not an accidental killing, it was not an "I'm not sure why I killed
> him."  Reasons are not apparent to me.  This is a premeditated, cold, deliberate
> killing, and his own words help focus down on the truth of his intent.  We don't
> have to guess, because we have his own words, Your Honor, focusing his intent
> when he commits a crime, a violent crime, against a stranger, a robbery and an
> assault against a total stranger, chased down, put to the ground.

19  Exh. 3H at 368.

20     The trial court ruled:

21
22
23
24

> [T]he Court does find that [petitioner's statements] can be relevant and
> admissible on issues related to intent, and in that regard thinks that the fact of
> the timing of these being after the incident with Mr. Worcester and Mr.
> LaBonte, that the fact that the timing is afterwards is not fatal to their relevance
> on the issue of intent.  So the Court does not find it is simply character
> evidence, but finds that it could be relevant on the issue of intent.  So the
> defendant's statements to the inspector with regard to this incident are allowed.

25  Exh. 3H at 370-371.

26     Robert Shay testified that on April 16, 2000, at 8:00 p.m., he was in the passenger seat of

27  a car which was traveling west on 16th Street near Harrison Street in San Francisco.  He saw three

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

12

men standing over a woman who was lying in the middle of the street. They were beating her up. He saw one person kick her. Another person removed her shoes. Twenty minutes later, Shay identified petitioner as one of the three men in a cold show. But he could not make the identification in court. Exh. 4E at 1027-1040, 1055. Defense counsel did not cross-examine Shay.

Ledia McCready testified she was attacked by three men near 16th Street and Bryant Street. She heard their voices while they ran towards her. She fell down as they came up to her, and they hit and kicked her while she lay on the ground. She suffered three bruised ribs and a broken rib; her face was black and blue. She could not identify petitioner at trial. Exh. 4E at 1043-1050. Defense counsel did not cross-examine McCready.

Officer Malcolm Anderson testified he responded to the 911 call regarding McCready. McCready looked like she had been beaten badly on the head and had a black eye. Officer Anderson was present at a cold show a few minutes after the attack; Shay identified petitioner and the two accomplices as the assailants. Exh. 4E at 1052-1056. Defense counsel did not cross-examine Officer Anderson.

Defense counsel reminded the trial court of his objection to the preceding evidence. Exh. 4E at 1058. He indicated that he had asked the trial court off the record to instruct the jury with CALJIC No. 2.50 (Evidence Of Other Crimes) at the end of trial rather than before introduction of the evidence. Exh. 4E at 1058. The trial court indicated that the prosecutor had asked off the record that the instruction be given contemporaneously, but it had decided to wait until the end of trial. Exh. 4E at 1059.

A short while later, defense counsel argued again that petitioner's statement to police that "he did not give a fuck" about strangers was "pure propensity evidence." Exh. 4E at 1133. The trial court declined to change its ruling on the admissibility of petitioner's statement. Exh. 4E at 1134-1135.

A month later, defense counsel again argued that petitioner's statement to police should be excluded. Exh. 4Q at 2627-2629. The trial court ruled that one-and-a-half pages of the three-page transcript would be admitted. Exh. 4Q at 2629. Defense counsel restated his objection.

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus    Mooring v. Walker
C 07-5013 SI (pr)

13

1   Exh. 4Q at 2631.

2        Inspector William Canning testified he was involved in the investigation of the assault on

3 McCready on April 16, 2000.  Exh. 4Q at 2636.  He spoke to petitioner that evening at the police

4 station.  Exh. 4Q at 2636-2637.  The conversation with petitioner was recorded on a cassette tape.

5 Exh. 4Q at 2639.  Exhibit 112 was played for the jury.  Exh. 4Q at RT 2641.  The jury heard

6 petitioner tell Inspector Canning, "Where I'm from, you don't get into nobody's business . . . .  If it

7 ain't my folks, if it ain't my folks, I don't give a fuck."  Exh. 5 (People's Exh. 112-A at 1-2).  He then

8 repeated five more times, "If it ain't my folks, I don't give a fuck."  *Id.* at 2.

9        During closing argument, the prosecutor argued:

10       So when you're trying to answer the question did this man accidentally kill
      or intend to kill Shayne Worcester, remember, his assault of Ledia McCready
11       in April of 2000, as well as his assault of Ray LaBonte two hours before he
      killed Shayne Worcester, you can use that information just for this purpose: to
12       help you answer the intent question.

13 Exh. 4X at 3251.

14        At the close of evidence, the trial court instructed the jury in the language of CALJIC No.

15 2.50 as follows:

16       Evidence has been introduced for the purpose of showing that the
      defendant committed a crime other than that for which he is on trial.
17

18       This evidence, if believed, may not be considered by you to prove that
      defendant is a person of bad character or that he has a disposition to commit
      crimes.   It may be considered by you only for the limited purpose of
19       determining if it tends to show:

20       A characteristic method, plan or scheme in the commission of criminal acts
      similar to the method, plan or scheme used in the commission of the offense in
21       this case which would further tend to show the existence of the intent to kill
      which is a necessary element of the crime charged.
22

23       For the limited purpose for which you may consider such evidence, you
      must weigh it in the same manner as you do all other evidence in the case.  You
      are not permitted to consider such evidence for any other purpose.
24

25 Exh. 2C at 721.

26     **B.**    **California Court Of Appeal Opinion**

27

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
C 07-5013 SI (pr)

14

1           **1.    Evidence Of McCready Incident**

2           The Court of Appeal ruled that the evidence of the McCready incident was admissible

3 under California law. Exh. 9 at 16. The court found that there were sufficient similarities between

4 the McCready incident and the charged offenses to admit the evidence as to petitioner's intent or

5 deliberation in killing Worcester. *Id.* The court noted that the beating of McCready in particular

6 "reflected an intent to injure a complete stranger beyond what was necessary to perpetrate the

7 robbery, and supported the argument that Mooring not only intended to rob Worcester, but wanted

8 to hurt him as well." *Id.* at 16-17. The court observed that petitioner's intent was material to the

9 murder charge because there was testimony that the shooting was accidental or unintentional. *Id.*

10 at 17.

11           The court additionally found that, under California law, the probative value of the

12 McCready incident was not outweighed by its potential prejudicial effect. Exh. 9 at 18. The court

13 found that because the McCready incident did not involve a shooting or killing, it was not more

14 inflammatory or egregious than the shooting of Worcester. *Id.* The court also noted that the

15 evidence had an adequate degree of reliability because petitioner had pleaded guilty to assaulting

16 McCready. *Id.* at 18-19. Petitioner's guilty plea also meant that the jury would not be distracted

17 by having to determine whether the McCready incident actually occurred, and would not be tempted

18 to convict petitioner of the Worcester murder to ensure punishment on the McCready incident. *Id.*

19 at 19. Finally, the court noted that "the trial court instructed the jury, in accordance with CALJIC

20 No. 2.50, to use the evidence only as it related to Mooring's intent, and not as evidence of bad

21 character or predisposition." *Id.* at 19.

22           **2.    Evidence Of Petitioner's Statement To The Police**

23           The Court of Appeal questioned whether petitioner's statement to the police after the

24 McCready incident that he "'[didn't] give a fuck' about people who [were] not his 'folks'" was

25 really probative of his intent in shooting Worcester. Exh. 9 at 20. The court found that, assuming

26 it was error to admit the statement, the error was harmless. *Id.* at 22. The court evaluated the error

27 under the state law standard of harmless error review rather than the federal constitutional standard,

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

15

1   finding that "[t]he statement was not wholly irrelevant or so highly prejudicial that it rendered the

2   trial fundamentally unfair and violated Mooring's federal due process rights." *Id.* (citing *McKinney*

3   *v. Rees*, 993 F.2d 1378 (9th Cir. 1993)).

4

5       **C.   The Court Of Appeal's Decision Did Not Constitute An Unreasonable Application Of Supreme Court Law**

6           **1.   Standard For Reviewing Evidentiary Claims On Federal Habeas**

7           The admission of evidence violates due process "[o]nly if there are no permissible

8   inferences the jury may draw from the evidence . . . . Even then, the evidence must 'be of such

9   character as necessarily prevents a fair trial.'" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.

10  1991).  In other words, even if evidence is not clearly probative, its admission does not violate due

11  process unless the evidence was so prejudicial as to render the trial fundamentally unfair. *Romano*

12  *v. Oklahoma*, 512 U.S. 1, 12-13 (1994).  The admission of other crime evidence in particular does

13  not violate due process when the trial court gives a limiting instruction and retains its discretion to

14  limit or forbid the admission of particularly prejudicial evidence. *Spencer v. Texas*, 385 U.S. 554,

15  561 (1967).

16          **2.   Evidence Of McCready Incident**

17          Petitioner has failed to demonstrate how the admission of the McCready incident violated

18  his due process rights.  As the California Court of Appeal found, petitioner's extreme use of force

19  against McCready evidenced "an intent to injure a complete stranger beyond what was necessary

20  to perpetrate the robbery, and supported the argument that Mooring not only intended to rob

21  Worcester, but wanted to hurt him as well." Exh. 9 at 16-17.  The evidence was therefore probative

22  of a material issue in the case—petitioner's intent to kill Worcester.  As the jury could draw a

23  permissible inference from such evidence, its admission did not violate due process. *Jammal*, 926

24  F.2d at 920.

25          Additionally, before admitting such evidence, the trial court determined that its probative

26  value was not outweighed by its potential prejudicial effect.  Also, at the end of trial, the court

27  instructed the jury that it could consider such evidence only as it related to petitioner's intent, and

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

16

1   not as evidence of bad character or predisposition.  Given this exercise of discretion and limiting

2   instruction by the trial court, the admission of the McCready incident did not violate due process.

3   *Spencer*, 385 U.S. at 561; *Williams v. Stewart*, 441 F.3d 1030, 1040 (9th Cir. 2006).

4          Even assuming such evidence was not clearly probative of any issue in the case, it was not

5   so prejudicial as to deny petitioner a fair trial.  As the Court of Appeal found, because the McCready

6   incident did not involve a shooting or killing, it was not more inflammatory than the Worcester

7   shooting.  In addition, because petitioner pleaded guilty to assaulting McCready, such evidence had

8   an adequate degree of reliability, and reduced any danger of the jury convicting petitioner simply

9   to punish him for the McCready assault.  Accordingly, because the McCready evidence was not so

10  prejudicial as to render the trial fundamentally unfair, petitioner was not denied due process.

11  *Romano*, 512 U.S. at 12-13.  For these same reasons, the admission of the McCready incident did

12  not have a substantial or injurious effect on the verdict.  *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007).

13         **3.    Evidence Of Petitioner's Statement To The Police**

14         Petitioner has also failed to demonstrate how the admission of his statement to the police

15  that he "'[didn't] give a fuck' about people who [were] not his 'folks'" violated his due process

16  rights.  Although the California Court of Appeal questioned whether petitioner's statement was

17  really probative of his intent to kill Worcester, and assumed it was error to admit such statement,

18  it also concluded that its admission did not violate due process.  More specifically, it found that

19  "[t]he statement was not wholly irrelevant or so highly prejudicial that it rendered the trial

20  fundamentally unfair and violated Mooring's federal due process rights."  Exh. 9 at 22 (citing

21  *McKinney*, 993 F.2d 1378).  Such conclusion was not unreasonable.

22         The introduction of petitioner's statement to the police was not so prejudicial as to render

23  petitioner's trial fundamentally unfair.  *Romano*, 512 U.S. at 12-13; *see Hamilton v. Vasquez*, 17

24  F.3d 1149, 1159 (9th Cir. 1994).  The statement was not particularly shocking or damning,

25  especially in relation to the other evidence presented at trial.  Moreover, the trial court cautioned the

26  jury against using the evidence to infer bad character or criminal disposition.  Exh. 2C at 721.  In

27  sum, this was not a "case in which the statements at issue are so clearly prejudicial that a curative

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

17

1    instruction could not mitigate their effect." *Dubria v. Smith*, 224 F.3d 995, 1002 (9th Cir. 2000) (en

2    banc).

3         Finally, given the overwhelming evidence of guilt presented at trial, the introduction of

4    petitioner's statement did not have a substantial or injurious effect on the verdict. *Fry*, 127 S. Ct.

5    at 2328. The Court of Appeal summarized the case against petitioner as follows:

6         The evidence against Mooring was substantial if not overwhelming.
     Kennedy and Edwards testified Mooring was with them as they drove San
7    Francisco streets looking for someone to rob. As to the LaBonte robbery and
     assault, Edwards testified that he and Mooring robbed LaBonte and Mooring
8    struck LaBonte in the face with the .22-caliber rifle. Kennedy also testified that
     Mooring got out of the car with the rifle, returned to the car with the rifle, and
9    said "a bullet fell out" when asked why he hit LaBonte.

10        As to the Worcester shooting, Edwards offered that Mooring and Collier
     got out of the car when they saw Worcester and Farley, he heard the sound of
11   gunshots, and then Mooring and Collier ran back to the car. Kennedy testified
     that Mooring and Collier got out of the car, Mooring had Kennedy's gun,
12   Kennedy heard the sound of his gun firing, Mooring had the gun when they ran
     back to the car, and Mooring said "I don't know" when Collier asked why he
13   shot Worcester. According to Investigator Olsen, Edwards claimed that
     Mooring had admitted shooting Worcester, albeit by accident. According to
14   Kennedy and Kennedy's mother (Williams), when Williams asked Mooring if
     he perpetrated the Worcester shooting, he replied to the effect of, "Yeah, I did
15   it." Beteast recalled Mooring saying he robbed and shot a tourist because he
     needed money. Mooring's own statements to the police were incriminating as
16   well, as he essentially acknowledged he was at the scene and claimed that by
     explaining what happened he would be "incriminating [him]self."

17
          We recognize there were witness credibility issues and strenuous defense
18   arguments as to the identity of the person who actually shot Worcester.
     Mooring's culpability, however, did not turn on whether he was the actual
19   shooter. Based on the record we review, it is not reasonably probable that the
     outcome of trial would have been more favorable to Mooring if the evidence of
20   his statement to police had been excluded. Mooring has failed to establish
     reversible error.

21

22   Exh. 9 at 22-23. Given the strong case against petitioner, it cannot be shown that the introduction

23   of his statement to the police had a substantial or injurious effect on the verdict.

24   ///

25   ///

26   ///

27   ///

28
Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                                   C 07-5013 SI (pr)

18

1  ///

2  **III.**

3  **THE INADVERTENT ADMISSION OF HEARSAY THAT WAS**
4  **IMMEDIATELY STRICKEN FROM THE RECORD DID NOT**
   **VIOLATE PETITIONER'S CONFRONTATION RIGHTS UNDER**
5  **_CRAWFORD_**

6  Petitioner next contends that his confrontation rights under *Crawford v. Washington*, 541

7  U.S. 36 (2004) were violated when a police investigator inadvertently violated a court order and

8  testified about a hearsay statement made by a confidential informant.  However, because the trial

9  court immediately struck the hearsay from the record and instructed the jury not to consider it, no

10 confrontation violation is shown.

11    **A.    Trial Court Proceedings**

12    Before trial, the parties argued about whether the prosecutor should be allowed to elicit

13 evidence from Inspector Wynkoop regarding a confidential informant's role in identifying petitioner

14 as the person who shot Worcester.  The trial court ruled:

15        The Court heard an in-camera hearing related to the motion to disclose a
          reliable informant. The Court made orders at that time. Those orders still stand
16        with regard to what was not to be disclosed and what was not to be revealed
          with regard to this.  The Court does not find any infirmity in what the district
17        attorney has proposed with regard to the opening statement and what he
          anticipates to prove related to that.
18
          Clearly, if there are questions that invite hearsay responses that the Court
19        has already ruled are not going to be allowed in, those are not going to be
          allowed in and counsel on both sides are already on notice of the issues that the
20        Court has ruled about in that regard from prior hearings.

21 Exh. 4A at 451.

22    During his opening statement, the prosecutor told the jury that Inspector Wynkoop met

23 with "Bobby" in the course of his investigation.  Exh. 4A at 479.  "After that meeting, the police had

24 a photograph from Bobby of Mr. Mooring, a torn photograph.  And they leave the meeting with

25 Bobby.  But they have this torn photograph.  You'll see it.  We still have it.  Of the defendant."  *Id.*

26    The prosecutor called Inspector Wynkoop to testify three weeks later.  He testified that

27 he met with Bobby and her male friend at the Bashful Bull restaurant on September 8, 1999.  Exh.

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                      C 07-5013 SI (pr)

19

1  4L at 2122.  The prosecutor asked Inspector Wynkoop if Bobby gave him "anything tangible that

2  you took away from the meeting."  *Id.* at 2124.  He answered, "She gave me a photograph of an

3  individual *that she said was responsible for the killing*."  *Id.* at 2125 (italics added).  Defense

4  counsel immediately objected and requested a mistrial.  The trial court called a recess.  *Id.*

5         During an in camera hearing, defense counsel argued as follows:

6               What has always been clear is that no hearsay that has been provided by
         Bobby is admissible in this trial ever . . . .  [Inspector Wynkoop stated he
7         received] a torn photograph, of our client, Mr. Mooring.  And with the added
         comment from the inspector that it was a picture of the person responsible,
8         therein lies the rub.  That is the inadmissible hearsay.  That is the information
         that has been barred from this trial, and that is . . . a bell that cannot be unrung
9         by any curative instruction.  It is an out-of-court identification of a perpetrator
         of the charges in this case, someone who we have made a motion concerning,
10        we have been denied access to, and now, specific court orders have been
         violated.  Whether it is by intention or otherwise, it certainly has undermined
11        our ability to defend Mr. Mooring, and we would ask the Court to grant a
         mistrial at this time.

12

13 Exh. 4L at 2126.

14        The prosecutor argued, "I consider the answer given an unintentional slip by the witness

15 because of my instructions to him.  I do believe that an instruction from you that the information

16 should be disregarded would be curative, and the law does recognize that you have the power to cure

17 something inadvertent like that."  Exh. 4L at 2127.

18        The trial court asked, "Has that photograph been admitted into evidence?"  Exh. 4L at

19 2127.  The prosecutor stated the photograph had been referred to by two witnesses.  *Id.*  Both

20 defense counsel indicated that an enlargement of the photograph had already been held up to the

21 jury.  *Id.* at 2127-2128.

22        The trial court asked counsel to put on the record what had been discussed in chambers

23 prior to Inspector Wynkoop testifying.  Exh. 4L at 2130.  Defense counsel indicated that the

24 evidence suggested that Bobby was probably Leslie Devlin, Kennedy's long-term girlfriend.  *Id.* at

25 2130-2131; *see also* Exh. 4J at 1820-1821.  He went on to argue:

26              The Court is aware of that, and I believe the Court has always advised the
         prosecution very clearly, that you cannot elicit hearsay evidence concerning this
27        meeting . . . .   [W]e weren't going to make that identification of that DMV
         photo, that link between Leslie who has, through the testimony of Willie
28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus                Mooring v. Walker
                                                                                                  C 07-5013 SI (pr)

20

1

2

Kennedy, been portrayed as a nexus for all four of these people at a motel room on the western part of Lombard Street going towards the bridge . . . .

3

4

5

6

[N]ow the People have, whether by design or otherwise, have gone over the line, and they have elicited hearsay connecting a photo, which the jury is fully informed of both in its small size and its enlarged size, that has been identified on the record as that of Daniel Mooring, and that she identified him as the perpetrator. Rank hearsay. We moved for a mistrial at that time in what we thought was a timely fashion, and this, we believe, is not the kind of evidence that we routinely see in courts. This is the type of evidence that we are vigilant in guarding against, carefully guarding against.

7

8

Exh. 4L at 2133-2134.

9

10

The prosecutor stated, "I do not know for certain that this person, Leslie Devlin, is Bobby." Exh. 4L at 2135. He added that Inspector Wynkoop, who met Bobby, did not know that for sure either. *Id.* at 2135-2136.

11

12

13

14

15

16

17

18

19

20

Defense counsel added, "Another thing that was discussed in chambers, and everyone was warned about, was not to elicit hearsay." The trial court replied, "Right." Exh. 4L at 2136-2137. Later, it added, "I also indicated that there was not to be any hearsay elicited from the inspector with regard to the conversation that he had with the person known to him as Bobby. And it is that, it is a violation of that order that has, I assume, caused the request for the mistrial." *Id.* at 2140. Defense counsel replied, "Yes." *Id.* The trial court indicated that the prosecutor did not ask the inspector to tell what Bobby said, "but in response to that question, he provided very significant hearsay information from this person Bobby . . . . [¶] I do view this as a very serious breach of a court order regarding the hearsay issue on what is clearly a very important issue in the trial." *Id.*

21

22

23

24

The next day, the trial court observed that "I note that in this testimony of Inspector Wynkoop, that he does not make reference to a torn photograph. He only says, 'She gave me a photograph,' and that was an issue that I looked at, because I was aware of that connection to that other photograph." Exh. 4M at 2152-2153. The prosecutor conceded that the hearsay statement was an error that needed to be cured, but "[t]he error can be cured by an instruction." *Id.* at 2163-2164.

25

26

27

28

The trial court ruled, "I think there are remedies in this case short of a mistrial that can be appropriate. Had the inspector, in his testimony, actually identified the photograph of the defendant, if that link had been made, I think it's a much stronger argument for a mistrial. That link has not

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

21

been made." Exh. 4M at 2166.  The court went on:

> I don't think that that statement, in and of itself, is enough of a link to the defendant in this case to have caused damage of constitutional dimension in all of the circumstances of this case . . . .

> She does not make reference to it being a torn photograph.  I think that might also have been a problem, given that the photograph of the defendant is the only one that appears to have been a torn photograph, that I'm aware of, at least.  But she doesn't do that.

*Id.* at 2167.  The trial court concluded:

> The Court is going to strike and order the jury to disregard all of the evidence with regard to Bobby, not only – now, I don't believe anybody else has talked about it except Inspector Wynkoop . . . .

> That all of his testimony with regard to Bobby is stricken and is to be disregarded.  That includes not just the one statement that he said at the end, but it includes his meeting with her, his descriptions of her.  The entire information regarding Bobby is stricken.

*Id.* at 2174-2176.

The trial court admonished the jury:

> Ladies and gentlemen, due process of law requires that the evidence received in a trial meet certain standards.  For example, witnesses must be sworn to tell the truth and must be subject to cross-examination.  A witness may generally testify about events the witness has seen or heard.  A witness is generally not allowed to testify about statements the witness has heard from others because such statements, known as hearsay, are not under oath and are not subject to cross-examination.  Such statements are only admitted in certain limited and specific situations where the law allows it.  In this case, Inspector Wynkoop violated a direct court order by testifying to certain hearsay information.  The defense properly objected and I sustained their objection.

> You are now instructed to completely disregard that portion of Inspector Wynkoop's testimony which discussed his meeting at the Bashful Bull restaurant on September 8, 1999.  You are not allowed to consider or discuss that testimony in any way in your deliberations.  Treat it as though you had never heard it at all.

Exh. 4M at 2178.

A little while later, the trial court instructed the jury:

> Ladies and gentlemen, you are instructed to completely disregard all testimony in this case relating to People's Exhibit 103 and 103-A [the small and enlarged photographs of appellant].  You are not allowed to consider or discuss that testimony in any way in your deliberations.  Treat it as though you had

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

22

1    never heard it at all.

2    Exh. 4M at 2220.

3    **B.    California Court Of Appeal Opinion**

4         The Court of Appeal found that *Crawford* did not apply.  The court noted that in

5    *Crawford*, "the jury was *permitted* to consider testimonial hearsay in deciding whether the defendant

6    was guilty," whereas here, "the jury was *precluded* from considering testimonial hearsay in deciding

7    Mooring's guilt."  Exh. 9 at 27.  The court concluded that the issue before it "is not whether

8    Mooring was prejudiced by the use of testimonial hearsay evidence against him, but whether the trial

9    court took adequate steps, including striking the evidence, to prevent such use.  The adequacy of the

10   court's curative efforts is generally a matter of state law."  *Id.*

11        The court went on to find that the trial court did not abuse its discretion by taking

12   corrective action and denying petitioner's motion for a mistrial.  Exh. 9 at 31.  First, the court noted

13   that the "jury likely understood from the beginning that [the] legitimacy [of the statement] was in

14   doubt" given that an objection was promptly made, recess taken, and the jury swiftly admonished

15   to disregard the statement.  *Id.* at 28.  Second, the court found that the statement was "not extremely

16   prejudicial" because "it is unlikely the jury would have given the statement much relative weight."

17   *Id.* at 29.  More specifically, "Wynkoop's statement that Bobby gave him a photograph of the

18   responsible person—without the jury seeing who was pictured in the photograph, hearing from any

19   witness it was a photograph of Mooring, or learning any basis for Bobby knowing who was

20   responsible—pales in comparison to the other evidence that Mooring was in fact the shooter."  *Id.*

21   at 28-29.  Third, the court noted the following:

22             As to the court's curative efforts, it is generally presumed that striking
          evidence and admonishing the jury cures evidentiary error.  Here, the court's
23        striking of the evidence and admonition were prompt, clear, and all-
          encompassing:  no consideration of Inspector's Wynkoop's testimony
24        concerning Bobby.  Because Inspector Wynkoop was the only source of
          evidence about informant "Bobby," the admonition effectively eliminated
25        Bobby from the trial.  There is no indication in the record that the admonition
          was insufficient."

26

27   *Id.* at 29 (citations omitted).

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                                              C 07-5013 SI (pr)

23

1   The court rejected petitioner's argument that the trial court's remedy was inadequate

2   because "the judge erroneously believed no connection had been made between the photograph

3   Bobby gave Inspector Wynkoop and the photograph of Mooring, which had been shown to the jury,"

4   when in fact, "the prosecutor had made this connection in his opening statement three weeks

5   earlier." Exh. 9 at 29. The court found the argument unpersuasive for three reasons. First, the trial

6   court correctly understood "that there was no link *in Wynkoop's testimony* between the photograph

7   of the person responsible for the killing and the photograph of Mooring." *Id.* at 29-30. Second,

8   even if the jury was able to recall the prosecutor's opening statement that "the police had a

9   photograph from Bobby of Mr. Mooring," it also knew it could not use the statement as evidence

10  in reaching its verdict. *Id.* at 30. Third, "Even if the trial court overlooked the prosecutor's remark

11  in opening statement—as defense counsel and the prosecutor apparently did as well—there is no

12  indication the remedy ultimately imposed was inadequate." *Id.*

13      Finally, the court concluded that "even if Wynkoop's testimony to Bobby's hearsay

14  statement was of constitutional significance, the improper statement was harmless beyond a

15  reasonable doubt in light of the evidence of Mooring's guilt." Exh. 9 at 31.

16  **C.   The Court Of Appeal's Determination That *Crawford* Did Not Apply Was Not
         Objectively Unreasonable**

17

18      Relying on *Crawford*, petitioner characterizes the introduction of Bobby's hearsay

19  statement as a denial of his Sixth Amendment right to confrontation.

20      In *Crawford*, the United States Supreme Court held that the admission of testimonial

21  hearsay violates the Confrontation Clause where the defendant has no opportunity to cross-examine

22  the declarant. *Crawford*, 541 U.S. at 68-69. This case, however, does not involve the admission of

23  hearsay. Rather, the trial court immediately struck the objected-to hearsay from the record and

24  admonished the jury to disregard it. Thus, unlike the jury in *Crawford*, the jury in this case was

25  precluded from considering hearsay in deciding petitioner's guilt. Given this crucial distinction, the

26  state appellate court reasonably concluded that *Crawford* did not apply.

27      As to the court of appeal's determination under state law that the trial court did not abuse

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
                                                                                     C 07-5013 SI (pr)

24

its discretion in striking the hearsay and instructing the jury to disregard it instead of declaring a mistrial, such determination is not subject to review by this Court. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Rather, the only question on federal habeas is whether the inadvertent admission of hearsay that was subsequently stricken violated petitioner's due process rights. *See Romano*, 512 U.S. at 12-13; *Jammal*, 926 F.2d at 920.

The United States Supreme Court has noted that courts "presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it unless there is an 'overwhelming probability' that the jury will be unable to follow the instructions . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant . . . ." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *see also Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997) (presuming a jury follows instructions to disregard evidence unless it is an "extreme situation"). In this case, there is no basis for believing that the jury was unable to follow the court's instructions to disregard the hearsay evidence. On the contrary, given defense counsel's prompt objection to the isolated statement and the trial court's immediate admonition, it is unlikely that the jury gave the statement any consideration at all.

Nor was there a "strong likelihood" the statement was devastating to petitioner's case. *Miller*, 483 U.S. at 766 n.8. Inspector Wynkoop never identified petitioner as the person in the picture, nor did he reveal Bobby's identity or explain how she knew who shot Worcester. In other words, the statement did not directly implicate petitioner, and it lacked credibility because its source was unknown. Although the prosecutor mentioned in his opening statement that Bobby gave the police a photograph of petitioner, it is highly unlikely that any juror would have remembered such a minor detail three weeks later, especially since that detail had not yet been put in any type of context. In addition, the statement was hardly devastating to petitioner's case given that several other people identified him as the shooter. In sum, there is no reason to believe that the inadvertent admission of hearsay was not cured by the trial court's instructions in this case.

Finally, the statement did not have a substantial or injurious effect on the verdict. *Fry*, 127 S. Ct. at 2328. As the California Court of Appeal noted:

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus            Mooring v. Walker
                                                                                                                    C 07-5013 SI (pr)

25

1
2
3
4
5
6
7
8

Bobby purportedly made an unsubstantiated assertion that someone in a photograph was responsible for Worcester's killing. By comparison, Kennedy, Edwards, Beteast, and Kennedy's mother all explicitly identified Mooring as responsible, such that he was tied to Worcester's murder by both the observations of his accomplices and the words from his own mouth. Not only was there evidence he had the sawed-off Marlin rifle, and the sawed-off rifle was fired as he and Edwards robbed Worcester, it was confirmed that the rifling marks on the fatal bullets matched the unique characteristics of a Marlin firearm. The evidence that Mooring was "responsible for the killing" of Worcester was therefore overwhelming. And even if Bobby's purported statement could have been understood by the jury to mean that Mooring was the one who actually *shot* Worcester, it clearly did not contribute to the verdict, since the jury found that Mooring did *not* personally use a firearm in perpetrating the Worcester murder.

9   Exh. 9 at 31. Given such evidence, the statement was not prejudicial. *See Fry*, 127 S. Ct. at 2328.

10

11                                              **IV.**

12   **THE PROSECUTOR'S FAILURE TO DISCLOSE A POLICE REPORT**
     **SUMMARIZING AN AUDIOTAPED INTERVIEW WITH ONE OF THE**
13   **PROSECUTION WITNESSES DID NOT VIOLATE *BRADY***

14          Petitioner next claims that the prosecutor violated the mandatory disclosure requirements

15   set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide petitioner with a report

16   written by Marin County Sheriff Sergeant Michael Ridgeway, which summarized his audiotaped

17   interview with Kennedy. However, because the impeachment value of the report was slight, and

18   defense counsel was able to listen to the actual audiotape of the interview before cross-examining

19   Kennedy, petitioner was not prejudiced by the prosecution's failure to disclose the report.

20          **A.    Trial Court Proceedings**

21          On November 24, 1999, Marin County Sheriff Sergeant Ridgeway met with Kennedy.

22   Kennedy told Sergeant Ridgeway how he and the other three accomplices had participated in the

23   murder of Worcester. Exh. 8 at 6-8. Sergeant Ridgeway secretly recorded the conversation. *Id.* at

24   3 n.1, 7. Later that day, Kennedy agreed to talk to San Francisco Detectives Wynkoop and Cashen

25   at the Marin County Sheriff's department. *Id.* at 11. After that interview, Kennedy agreed to

26   accompany the inspectors to San Francisco. *Id.* at 12.

27          Sergeant Ridgeway wrote a report describing how he came into contact with Kennedy and

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

26

1   discussing Kennedy's statement to him. Exh. 8 at 6-12. Though the report was dated November 26,

2   1999 (*id.* at 6), it indicated that Sergeant Ridgeway mailed the audiotape and faxed his police report

3   to Inspector Wynkoop on November 29, 1999 (*id.* at 12).

4           Kennedy began his testimony in petitioner's trial on November 17, 2003. Exh. 4J at 1818.

5   On the morning of Kennedy's testimony, the prosecutor and both attorneys for petitioner listened

6   to the audiotape made by Sergeant Ridgeway. Exh. 8 at 3 n.1. According to petitioner, "most of the

7   audio tape is inaudible." *Id.* The audiotape was never introduced into evidence, and is not part of

8   the trial record.

9           Petitioner was sentenced on May 3, 2004. Exh. 4EE at 3456-3459. According to

10  petitioner, the police "report was faxed by Marin County Sheriff Lieutenant Ridgeway to

11  [Prosecutor] Dorfman on June 28, 2004 . . . ." Exh. 8 at 2.

12      **B.    California Court Of Appeal Opinion**

13          The Court of Appeal concluded that even if the report was favorable to the defense, its

14  disclosure would not have led to a more favorable verdict. Exh. 9 at 34. The court found that the

15  impeachment value of the report was "slight," given that Kennedy's testimony was corroborated by

16  other witnesses. *Id.* The court also found that because Kennedy was impeached in other ways at

17  trial, the report would not "have had any significant additional effect in this regard." *Id.* at 34-35.

18          In addition, the court noted that while the report merely reflected Ridgeway's recollection

19  of the interview with Kennedy, the prosecution provided petitioner with the best evidence of the

20  interview—the actual audiotape. Exh. 9 at 35. The court also noted that while petitioner claimed

21  most of the audiotape was inaudible, "it was apparently audible enough for defense counsel not only

22  to proceed with Kennedy's cross-examination, but to actually *quote* from Kennedy's interview with

23  Ridgeway several times during his intensive cross-examination." *Id.* In fact, it appeared that

24  defense counsel was referring to a written transcript of the interview during his cross-examination.

25  *Id.* at 36.

26          Finally, the court rejected petitioner's argument that he was prejudiced by his inability to

27  use the report to impeach Kennedy's testimony that petitioner told Kennedy's mother he shot

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

27

1  Worcester. Exh. 9 at 36.  The court observed that because the jury ultimately found that petitioner

2  had not personally used a firearm, it could not have been persuaded by Kennedy's testimony on this

3  point.  *Id.*

4      **C.  The Court Of Appeal Reasonably Applied *Brady* And Concluded That
           Petitioner Was Not Prejudiced By The Prosecutor's Failure To Disclose
5          Sergeant Ridgeway's Report**

6          In *Brady v. Maryland*, 373 U.S. at 87, the United States Supreme Court held "that the

7  suppression by the prosecution of evidence favorable to an accused . . . violates due process where

8  the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

9  of the prosecution."  "There are three components of a true *Brady* violation: The evidence at issue

10 must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

11 evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

12 must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999) (footnote omitted).

13 Prejudice requires a reasonable probability, based on all of the evidence, that the defendant would

14 have realized a more favorable verdict if the undisclosed evidence had not been suppressed.

15 *Strickler*, 527 U.S. at 282, 289-290.

16         The California Court of Appeal reasonably concluded that petitioner suffered no prejudice

17 as a result of the prosecutor's failure to disclose the report.  First, the impeachment value of the

18 report was insignificant in relation to the other impeachment evidence introduced at trial.  Thus, for

19 instance, there was ample evidence that Kennedy was testifying to avoid serious punishment for his

20 own involvement in the crimes (Exh. 4K at 2007-2012); he possessed several guns, including the

21 murder weapon (*id.* at 1968); he committed a subsequent home invasion robbery (*id.* at 1942-1943);

22 he was living in a rehabilitation facility at the time of his testimony (*id.* at 1943); and he received

23 payments from the witness protection program for housing, meals, and incidentals (*id.* at 1942).  In

24 addition, defense counsel questioned Kennedy on so many details, including his grand jury

25 testimony, that it is impractical to discuss each one here.  In short, Kennedy's credibility was

26 thoroughly impeached, and there is no probability that some further advantage would have been

27 gained from introduction of Sergeant Ridgeway's report.

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

28

1    "[W]here the undisclosed evidence merely furnishes an additional basis on which to

2    challenge a witness whose credibility has already been shown to be questionable or who is subject

3    to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and

4    hence not material." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998). Here, the evidence

5    from Sergeant Ridgeway's report would have done absolutely nothing to further impeach Kennedy.

6    *See Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has

7    already been substantially called into question in the same respects by other evidence, additional

8    impeachment evidence will generally be immaterial and will not provide the basis for a *Brady*

9    claim"); *see also Clay v. Bowersox*, 367 F.3d 993, 1000 (8th Cir. 2004); *Simental v. Matrisciano*,

10   363 F.3d 607, 614 (7th Cir. 2004); *Shabazz v. Artuz*, 336 F.3d 154, 166 (2d Cir. 2003).

11   Second, defense counsel listened to the actual audiotape recording Sergeant Ridgeway

12   made of his interview with Kennedy prior to cross-examining Kennedy. Thus, while the report

13   merely reflected Sergeant Ridgeway's recollection of his interview with Kennedy, the actual

14   audiotape recording heard by defense counsel was the best evidence of the interview. *See United*

15   *States v. Prior*, 546 F.2d 1254, 1259 (5th Cir. 1977) (prosecutor is not required to furnish defendant

16   with information he already has or could obtain with reasonable diligence). Counsel even referred

17   to the interview during his cross-examination of Kennedy, which undermines any claim that the

18   audiotape was inaudible. *See* Exh. 4K at 1945-1947, 1958-1963. Accordingly, because petitioner

19   was able to question Kennedy about statements he made during his interview with Sergeant

20   Ridgeway, petitioner could not have suffered any prejudice from the prosecution's failure to disclose

21   the report.

22   Finally, as discussed in Arguments II and III above, the evidence of petitioner's guilt was

23   so overwhelming that it is simply inconceivable that the failure to disclose the report could have had

24   a substantial or injurious effect on the verdict. *Fry*, 127 S. Ct. at 2328.

25

26

27

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                       C 07-5013 SI (pr)

V.

**THE FAILURE TO REQUIRE JURY UNANIMITY ON AN UNDERLYING THEORY OF GUILT DOES NOT VIOLATE THE SIXTH OR FOURTEENTH AMENDMENT**

Petitioner next contends that the trial court's failure to require jurors to unanimously find him guilty as either a direct perpetrator or as an aider and abettor violated his Sixth and Fourteenth Amendment rights as set forth in *Blakely v. Washington*, 542 U.S. 296 (2004), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). However, the United States Supreme Court's decision in *Schad v. Arizona*, 501 U.S. 624, 630-645 (1991) (plurality opinion)—that jury unanimity is not required on underlying legal theories—is controlling in this case.

**A.    Trial Court Proceedings**

The trial court noted for the record that the parties had discussed and proposed modifying instructions indicating that the jury need not decide unanimously whether petitioner was guilty as a direct perpetrator or as an aider and abettor. The trial court stated that it had reviewed *People v. Culuko*, 78 Cal. App. 4th 307 (2000), and asked for the parties' argument. Exh. 4V at 3102-3103.

The prosecutor argued:

> Based on the *Culuko* case, Your Honor, the law of California teaches us that a jury does not have to agree unanimously on the theory of murder liability so long as each juror is convinced beyond a reasonable doubt according to an appropriate theory . . . . *Culuko* teaches that you can explicitly tell the jury that they do not have to have unanimity under the theory they have chosen . . . .

Exh. 4V at 3103.

Defense counsel conceded that the prosecutor was correct under California law, but stated for the record an objection based on the Sixth Amendment. Exh. 4V at 3104-3108. The objection was as follows:

> I think the Sixth Amendment requires that jurors agree on specific facts. That it is a violation of Mr. Mooring's right to a unanimous jury verdict to have 12 people not agree on a set of facts for which he is held liable in a case where his exposure is life without parole. I think it offends the Sixth Amendment.

*Id.* at 3104. Defense counsel also argued that even if the case law did not require unanimity when

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
C 07-5013 SI (pr)

30

1  deciding between liability as a direct perpetrator and an aider and abettor, there was no support for

2  not requiring unanimity as a coconspirator.  *Id.* at 3105-3106.

3        The trial court ruled that it would not require unanimity on the theories of direct

4  perpetrator and aider and abettor:  "I will allow a special instruction that deals with the aiding and

5  [a]betting and direct perpetrator theory.  In the language that you have given, Ms. Manson, I would

6  delete the second paragraph.  I would delete the coconspirator language . . . ."  4Y at 3314.  As to

7  conspiracy theory, the trial court ruled that the jury had to be unanimous on that theory.  Exh. 4V

8  at 3115.

9        The trial court instructed the jury pursuant to *Culuko*, 78 Cal.App.4th at 321, as follows:

10             Those who aid and abet a crime and those who directly perpetrate a crime
              are principals and equally guilty of the commission of that crime.

11

12             To determine whether the prosecutor has proven beyond a reasonable
              doubt that the defendant is either a direct perpetrator or an aider and abettor,
              you must follow the instructions for each of these theories that I have given

13             you.

14             You do not need to unanimously agree whether a defendant is a direct
              perpetrator or an aider and abettor.  Each individual juror does not need to

15             choose between the theories, so long as each individual juror is convinced
              beyond a reasonable doubt of the defendant's guilt based on the evidence

16             presented at trial.

17             A juror who is convinced of the defendant's guilt may have a reasonable
              doubt that the defendant was the direct perpetrator or a reasonable doubt that

18             the defendant was an aider and abettor, but no such doubt as to either theory.
              A juror who has a reasonable doubt that the defendant was the direct perpetrator

19             and a reasonable doubt that the defendant was an aider and abettor may not vote
              to convict the defendant on either of those theories.

20

21  Exh. 4X at 3178-3179; Exh. 2C at 747.

22        The jury found petitioner guilty of first degree special circumstance murder.  Exh. 2C at

23  826-833; Exh. 4BB at 3403-3407.

      **B.    California Court Of Appeal Opinion**

24        The Court of Appeal noted that the "trial court instructed the jurors that they had to reach

25  a unanimous verdict to convict Mooring on the charge of murder, but they would not have to be

26  unanimous on whether he was guilty as the direct perpetrator or guilty as an aider and abettor."  Exh.

27  9 at 37.  The court rejected petitioner's argument that the decisions of the United States Supreme

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                    C 07-5013 SI (pr)

31

1  Court in *Blakely*, *Ring*, and *Apprendi* require jury unanimity on this issue. *Id.* The court noted that

2  "these cases stand for the proposition that all criminal *charges* must be confirmed by unanimous

3  vote. But none of the cases holds that jurors must unanimously agree on the *theory* underlying the

4  defendant's guilt." *Id.* Because none of those cases addressed unanimity in the context of the theory

5  underlying guilt, the court found them inapposite. *Id.*

6      Rather, the court found the United States Supreme Court's decision in *Schad v. Arizona*,

7  501 U.S. 624, 630-645 (1991) (plurality opinion), to be controlling. Exh. 9 at 37. The court noted

8  that under *Schad*, there is no requirement that jurors must unanimously agree on the theory

9  underlying the defendant's guilt. *Id.* The Court of Appeal accordingly followed *Schad* and rejected

10  petitioner's Sixth Amendment challenge. *Id.*

11

12  **C.  The Court Of Appeal Reasonably Followed *Schad* In Rejecting Petitioner's Unanimity Claim**

13

14      The United States Supreme Court has held that a jury need not unanimously agree on the

15  means by which a defendant committed a crime. *Schad*, 501 U.S. at 632. Thus, "[s]ubmitting a

16  multi-theory crime to the jury without requiring unanimity on any one predicate theory is not a

17  constitutional violation." *Evanchyk v. Stewart*, 340 F.3d 933, 937 n.1 (9th Cir. 2003).

18      Petitioner contends that the more recent decisions in *Blakely*, *Ring*, and *Apprendi* require

19  a unanimous finding by the jury on theories underlying the verdict. However, none of these

20  decisions addresses the question of whether jurors need to be unanimous in their theory of guilt.

21  Rather, they address when the constitution requires sentencing issues be submitted to a jury for

22  determination. *Blakely*, 542 U.S. at 298; *Ring*, 536 U.S. at 588-589; *Apprendi*, 530 U.S. at 469.

23  Accordingly, *Schad* is still controlling in the context of jury unanimity on theories underlying a

24  defendant's guilt, and the state court of appeal's denial of petitioner's claim was not an unreasonable

25  application of Supreme Court law.

26

27

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus     Mooring v. Walker
C 07-5013 SI (pr)

32

# VI.

## THE ADMISSION OF A PHOTOGRAPH OF THE VICTIM WHILE ALIVE DID NOT VIOLATE DUE PROCESS

Petitioner next claims the admission of a photograph of the victim while he was alive violated his right to due process and a fair trial. However, because the photograph was probative of Farley's relationship with the victim as well as his credibility, its admission did not violate due process.

### A.   Trial Court Proceedings

The prosecutor moved to admit one photograph of the following:

> Shayne Worcester while alive with witness Chris Farley. This photograph corroborates Farley's friendship with Worcester. This photograph helps explain why Farley and Worcester spent Tuesday evening, May 25, 1999[,] together drinking, dining and socializing during Mr. Worcester's last night in San Francisco before he returned to Maine. This photograph corroborates Farley's reliability as a witness when describing details about Worcester. This photograph is not unduly prejudicial . . . .
> The photograph shows Farley and Worcester standing next to each other. It is a wedding photo. No children are shown. No other adults are shown. Their expressions are unemotional.

Exh. 2B at 573-574.

At a hearing on the matter, defense counsel argued, "That photo . . . really doesn't help to explain the circumstances of the crime. It doesn't really add anything to the jury's understanding of the crime, and the People are not prejudiced by the exclusion of the photograph in their presentation in their case-in-chief in any way whatsoever." Exh. 3H at 361-362.

The prosecutor replied:

> It's true that Mr. Farley will describe features of Shayne Worcester. The photograph—these jurors don't know these men. They don't know Farley's relationship with Worcester. And just to hear the words out of Farley's mouth saying:  "Yes, I knew Mr. Worcester," well, here's a photograph, one photograph, that will say to the jury: "Yeah, we have this photograph that says they knew each other, too." It's not asking too much and the law allows it.

Exh. 3H at 363.

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

33

1     The trial court ruled, "The Court has had an opportunity to review that photograph now

2 and, under the authorities cited, does not find that it is unduly inflammatory and thinks it is

3 appropriate and will admit that photograph."  Exh. 3H at 363.

4     The prosecutor introduced the photograph while asking Farley preliminary questions about

5 his relationship to Worcester.  Exh. 4B at 680-683.  Farley testified, "That's Shayne on the left and

6 me on the right . . . .  [The picture was taken a]t my wedding."  *Id.* at 683.

7     During a later hearing on whether to admit an autopsy photograph, defense counsel

8 admitted the following:

9           I did express a concern—I'm not going to misrepresent our discussions—that
          the photo could only result in an unduly emotional reaction or shocked reaction
10          from Mr. Farley.  It wasn't clear to me that he'd ever seen this photo before.
          However, the Court overruled our objection at that time, and I will say that it
11          did not appear that Mr. Farley was unduly moved by it other than to say that
          yes, that was his friend.  That's true.

12

13 Exh. 4C at 851.

14     The prosecutor agreed, "Mr. Gaines is correct, Mr. Farley did not have an emotional

15 outburst at all.  And, in fact, I had told Mr. Farley before I showed him the photograph that I would

16 do such a thing so that he would not be surprised and there was no prejudice arising out of showing

17 the photo in an emotional sense."  Exh. 4C at 851.

18

19     **B.    California Court Of Appeal Opinion**

20     The Court of Appeal determined that the photograph was relevant to show that Farley and

21 the victim were close friends, and tended to support the believability of Farley's testimony

22 concerning the victim.  Exh. 9 at 39.  The court also found that the probative value of the photograph

23 was not outweighed by any prejudicial effect.  *Id.*  The photograph itself was neutral, and did not

24 invoke an emotional response from Farley.  *Id.*  Finally, the court found admission of the photograph

25 "clearly harmless."  *Id.*

26

27

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

1

**C.    The Court Of Appeal Reasonably Concluded That The Photograph Had Probative Value And Was Not Prejudicial**

2

3         The admission of evidence violates due process "[o]nly if there are no permissible

4    inferences the jury may draw from the evidence . . . . Even then, the evidence must 'be of such

5    character as necessarily prevents a fair trial.'" *Jammal*, 926 F.2d at 920.  Accordingly, even if

6    evidence is not clearly probative, its admission does not violate due process unless the evidence was

7    so prejudicial as to render the trial fundamentally unfair. *Romano*, 512 U.S. at 12-13.

8         The state appellate court reasonably concluded that the photograph of Farley and the

9    victim was relevant to show that they were close friends, and tended to bolster Farley's credibility

10   regarding the victim.  Accordingly, because the jury could draw a permissible inference from the

11   photograph, its admission did not violate due process. *Jammal*, 926 F.2d at 920.

12        However, even if the photograph was not probative, its admission did not prejudice

13   petitioner. *Romano*, 512 U.S. at 12-13.  Here, there was just one neutral photograph; it had no

14   discernible effect on the witness; and, as discussed above in Arguments II and III, the evidence was

15   overwhelmingly against petitioner.  Therefore, the photograph was not "of such character" as

16   necessarily prevented a fair trial. *Jammal*, 926 F.2d at 920.  For these same reasons, the photograph

17   did not have a substantial or injurious effect on the verdict. *Fry*, 127 S. Ct. at 2328; *Plascencia v.*

18   *Alameida*, 467 F.3d 1190, 1203 (9th Cir. 2006) (finding the admission of several premortem

19   photographs of the victim with her children did not have a substantial and injurious effect on the

20   verdict).

21                                    **VII.**

22        **PETITIONER'S *BLAKELY* CLAIM IS FORECLOSED BY *TEAGUE*;**
     **MOREOVER, THE STATE COURT REASONABLY REJECTED**
23        **PETITIONER'S CLAIM, AND ANY ERROR WAS HARMLESS**

24        Petitioner contends that, under *Blakely v. Washington*, 542 U.S. 296, the trial court erred

25   by imposing upper terms on the robbery and assault counts based on facts that were neither found

26   by the jury nor admitted by petitioner.  The Supreme Court's recent decision in *Cunningham v.*

27   *California*,  ___ U.S. ___, 127 S. Ct. 856 (2007), does not afford petitioner relief in this case.

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

35

1    Petitioner is foreclosed from relief because of *Teague v. Lane*, 489 U.S. 288, 310 (1989).  Also, the

2    California courts' rejection of petitioner's claim was not contrary to or an unreasonable application

3    of Supreme Court precedent.  28 U.S.C. § 2254(d).  Finally, any error was harmless.

4         **A.    Trial Court Proceedings**

5         The trial court imposed upper terms on counts two (robbery of Worcester), three (robbery

6    of LaBonte), and four (assault with a deadly weapon on LaBonte).  Exh. 4EE at 3448-3451,

7    3455-3461; Exh. 2A at 3-5; Exh. 2C at 898.  The trial court stated the following reasons in support

8    of its sentence:

9              [I]n considering the counts and the appropriate sentences as to Counts 2, 3 and
              4, the Court finds under California Rule of Court 4.423, that there are no
10             mitigating factors relating either to the crime or to the defendant.

11             With regard to the Counts 2, 3 and 4 in Rule of Court 4.421, the Court
              finds the following aggravated factors:  Under 4.421(a)(1), the crime involved
12             great violence disclosing a high degree of cruelty, viciousness, and callousness.
              Under  4.421(a)(8), the manner that the crimes were carried out indicates
13             planning.  And under 4.421(b)(1), the defendant engaged in violent conduct
              which indicates a serious danger to society.

14

15   Exh. 4EE at 3456.

16        **B.    California Court Of Appeal Opinion**

17        Citing *People v. Black*, 35 Cal. 4th 1238 (2005), the Court of Appeal concluded that

18   "*Blakely* does not apply to California's determinate sentencing law."  Exh. 9 at 40.

19        **C.    The *Cunningham* Decision**

20        In *Cunningham*, the United States Supreme Court held that California's procedure for

21   selecting upper terms violates the defendant's Sixth and Fourteenth Amendment right to jury trial

22   because it "assigns to the trial judge, not to the jury, authority to find the facts that expose a

23   defendant to an elevated 'upper term' sentence."  *Cunningham*, 127 S. Ct. at 860.  The Court

24   explained, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows

25   a judge to impose a sentence above the statutory maximum based on a fact, other than a prior

26   conviction, not found by a jury or admitted by the defendant." *Id.* (citing, inter alia, *Apprendi v. New*

27   *Jersey*, 530 U.S. 466, *Blakely v. Washington*, 542 U.S. 296, and *United States v. Booker,* 543 U.S.

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus              Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

36

1 | 220 (2005)).  The Court found that because California Penal Code section 1170(b), and the

2 | implementing California Rules of Court, allow for imposing an upper term only by a fact that a

3 | judge finds by a preponderance of the evidence, the jury trial and reasonable doubt requirements of

4 | due process are missing in California's "DSL" system. *Id.* at 868.  In reaching this decision, the high

5 | court rejected *People v. Black*, 35 Cal. 4th 1238, the California Supreme Court's decision holding

6 | that California's upper term procedure was constitutional under *Apprendi*, *Blakely*, and *Booker*.

7 | *Cunningham*, 127 S. Ct. at 868-871.

8 |

9 | **D.    Granting Relief Under *Cunningham* Or *Blakely* Would Violate *Teague***

10 |        In *Teague v. Lane*, 489 U.S. 288, the Supreme Court held that a new rule of constitutional

11 | law cannot be applied retroactively on federal collateral review to upset a state conviction or

12 | sentence unless the new rule forbids criminal punishment of primary, individual conduct or is a

13 | "watershed" rule of criminal procedure. *Caspari v. Bohlen*, 510 U.S. 383, 396 (1994).  The Supreme

14 | Court has repeatedly emphasized that federal habeas courts must first decide whether *Teague* is

15 | implicated before considering the merits of a claim if the state argues that the petitioner seeks the

16 | benefit of a new rule. *Beard v. Banks*, 542 U.S. 406, 412 (2004).  This is true regardless of whether

17 | the case is governed by the AEDPA.  *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see generally*

18 | *Arredondo v. Ortiz*, 365 F.3d 778, 781-782 (9th Cir. 2004) (identifying proper manner of raising

19 | *Teague* argument on appeal).

20 |        *Teague* involves a three-step analysis. *Hayes v. Brown*, 399 F.3d 972, 982 (9th Cir. 2005).

21 | First, the court must determine the conviction's finality date.  *Id.*  Second, the rule is considered new

22 | if, after, the court "survey[s] the legal landscape as it then existed," it determines that "existing

23 | precedent compelled a finding that the rule at issue was required by the Constitution." *Id.* (citations

24 | and internal quotation marks omitted).  Thus, a rule is not constitutionally compelled if the survey

25 | shows that "reasonable jurists" could differ about the outcome. *Caspari v. Bohlen*, 510 U.S. at 395.

26 | Third, if the rule is new, the court "must consider whether it falls within either of the two exceptions

27 | to nonretroactivity." *Beard*, 542 U.S. at 411.

28 |

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                       C 07-5013 SI (pr)

1    A conviction is final under *Teague* "when the availability of direct appeal to the state

2    courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a

3    timely filed petition has been finally denied." *Caspari v. Bohlen*, 510 U.S. at 390.  Here, petitioner's

4    petition for review was denied by the California Supreme Court on January 4, 2006.  Exh. 11.

5    Accordingly, his conviction became final ninety days later when the time for a petition for writ of

6    certiorari expired, on April 4, 2006.  *Bowen v. Roe*, 188 F.3d 1157, 1158-1159 (9th Cir. 1999); Sup.

7    Ct. R. 13.

8    Moreover, a survey of the relevant case law reveals that "reasonable jurists . . . 'would

9    [not] have deemed themselves compelled to accept [Petitioner's] claim'" that his right to jury trial

10   was violated when his conviction became final on April 4, 2006.  *Johnson v. Texas*, 509 U.S. 350,

11   366 (1993) (quoting *Graham v. Collins*, 506 U.S. 461, 477 (1993)).  It is true that the Supreme Court

12   recently declared that California's upper term sentencing system violates the right to a jury trial in

13   *Cunningham*, finding the dissent's comparison with the post-*Booker* federal system "unavailing."

14   *Cunningham*, 127 S. Ct. at 870.  But the fact that the Supreme Court has now decided that

15   California's upper term sentencing system violates *Blakely* does not mean that reasonable jurists

16   would have been compelled to reach that conclusion prior to the Court's decision in *Cunningham*.

17   *See Butler v. McKellar*, 494 U.S. 407, 415 (1990) (finding *Miranda* case of *Arizona v. Roberson*,

18   486 U.S. 675 (1988), to be a new rule under *Teague*, despite the *Roberson* majority's conclusion that

19   it was "directly controlled" by prior precedent, reasoning that "[c]ourts frequently view their

20   decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable

21   contrary conclusions reached by other courts").

22   Illustrating this principle in a capital context, the Supreme Court has held that its own

23   decision could not be applied retroactively because it created a new rule.  In *Skipper v. South*

24   *Carolina*, 476 U.S. 1, 4-5, 8 (1986), the Court concluded that it was unconstitutional for the death

25   penalty to be imposed on the basis of information of future dangerousness that the defendant had

26   no opportunity to deny or explain.  Later, in *Simmons v. South Carolina*, 512 U.S. 154, 168-169

27   (1994), the Court held that defendants must be allowed to inform their capital sentencing jury of

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

38

their parole ineligibility whenever the prosecution contends they are a future danger.  In *O'Dell v. Netherland*, 521 U.S. 151 (1997), the Court addressed whether *Simmons* was a new rule under *Teague*.  The Court rejected the argument that *Simmons* "presented merely a variation on the facts of *Skipper*," wherein "*Skipper* was unconstitutionally prevented from demonstrating that he had behaved in prison and thus would not be a danger to his fellow prisoners." *O'Dell*, 521 U.S. at 161.  The Supreme Court found the *Simmons* rule new because a reasonable jurist could have made a "distinction between information about a defendant [i.e., *Skipper*] and information concerning the extant legal regime [i.e., *Simmons*]." Id. at 165.  Just as *Simmons* was not necessarily dictated by *Skipper*, the recent *Cunningham* decision was not necessarily dictated by the Court's prior precedent.

In this regard, the Ninth Circuit's treatment of *Apprendi*, *Blakely*, and *Booker*, the earlier seminal cases in this area, unavoidably shows that *Cunningham* also was not dictated by prior precedent.  In each of these three cases, the defendant received punishment above the upper-most point of the initial prescribed sentencing range for the crime, based on a fact not found by the jury or admitted by the defendant.  In each case, the Supreme Court held that the defendant had the right to have the jury decide the existence of that fact.  *Booker*, 543 U.S. at 226-237 (right to have jury find fact raising the sentence from 262 months, the top of the "'base' sentence" of 210 to 262 months for the crime, to thirty years, where a separate grid box and a separate statute allowed for a life cap); *Blakely*, 542 U.S. at 298-305, 308-309 (right to have jury find fact raising the sentence from fifty-three months, the top of the "standard range" of forty-nine to fifty-three months for the crime, to ninety months, where a separate "exceptional sentence" provision allowed for a ten-year cap); *Apprendi*, 530 U.S. at 490 (right to have jury find fact raising sentence from ten years, the top of the "penalty range" of five to ten years for the crime, to twelve years, where a separate "hate crime" provision allowed for a twenty-year cap).

Although the holdings of *Apprendi*, *Blakely*, and *Booker* have some facial similarity—finding a violation of the defendant's jury trial right in imposing a sentence above the crime's initial range based on facts not found by the jury—each of these cases created a new rule under *Teague*.  The Ninth Circuit has held that *Apprendi* announced a new rule that may not be

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

39

1   applied retroactively to convictions final before its issuance.  *Cooper-Smith v. Palmateer*, 397 F.3d

2   1236, 1246 (9th Cir. 2005).  Although *Blakely* had facial similarity to *Apprendi*, the Ninth Circuit

3   nonetheless held that *Blakely* also created a new rule under *Teague*.  *Schardt v. Payne*, 414 F.3d

4   1025, 1027, 1038 (9th Cir. 2005).  The court held that *Blakely* was not dictated by *Apprendi*, noting

5   that several circuit courts had reached the opposite conclusion from *Blakely*.  *Id.* at 1035.  Similarly,

6   the Ninth Circuit determined that *Booker*, applying *Blakely* to the federal guidelines, constituted a

7   new rule under *Teague*, noting that justices had dissented in *Booker*.  *United States v. Cruz*, 423 F.3d

8   1119, 1120-1121 (9th Cir. 2005).[8/]  Just as each of the decisions in *Booker*, *Blakely*, and *Apprendi*,

9   arising in different contexts, created new rules, the recent decision in *Cunningham* created a new

10  rule:  imposition of an upper term within the initial prescribed sentencing range, based on a fact not

11  found by a jury, violates the right to jury trial, even where the trial court has broad discretion that

12  is reviewed for reasonableness.

13         Significantly, the Court's grant of review in *Cunningham* suggests that its holding was not

14  dictated by prior precedent.  In this regard, an important question of federal constitutional law

15  needed to be "settled," presumably because the answer was not all clear.  *See* Sup. Ct. R. 10(c).

16  Indeed, in the final analysis, not all the members of the Court agreed on the answer; rather, three

17  justices dissented.  *Cunningham*, 127 S. Ct. at  876-881 (Alito, J., dissenting); *see United States v.*

18  *Cruz*, 423 F.3d at 1120 (noting dissenting opinions in *Booker*).

19         Further, the conclusion that California's scheme complied with *Booker* in particular, while

20  now found to be incorrect, was nonetheless reasonable before *Cunningham*.  In *Booker*, the Court

21  found the mandatory Federal Sentencing Guidelines violated the Sixth Amendment, but the Court

22  judicially rendered the Guidelines as factors to be considered, and allowed that a sentence would

23  ultimately be subject to a "reasonableness" review.  *Booker*, 543 U.S. at 226-237, 248-265.

24  Although the *Cunningham* majority ultimately instructed there is "no room for such an examination"

25

26  _____

27        8.  The Supreme Court has also held that *Ring v. Arizona*, 536 U.S. 584, which applied
    *Apprendi* to Arizona's capital sentencing scheme, was a new procedural rule that could not be
28  retroactively applied under *Teague*.  *Schriro v. Summerlin*, 542 U.S. 348, 353-358 (2004).

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
                                                                                      C 07-5013 SI (pr)

(*Cunningham*, 127 S. Ct. at 869), the *Cunningham* dissent found that California's upper term sentencing was "indistinguishable" from this reformed sentencing scheme approved in *Booker* (*id.* at 873 (Alito, J., dissenting); *id.* at 876 (finding California's upper term sentencing scheme was "not meaningfully different" from reformed scheme approved in *Booker*). *See Simmons*, 512 U.S. at 164 (finding that a contrary holding "cannot be reconciled with our well-established precedents"); *O'Dell*, 521 U.S. at 165 (*Simmons* is a new rule under *Teague*).

Also, prior to *Cunningham*, at least two other state supreme courts with similar systems rejected claims that their systems violated the Sixth Amendment in light of *Booker* and *Blakely*. *See State v. Lopez*, 123 P.3d 754, 761-768 (N.M. 2005) (concluding its mandatory scheme complied with *Booker* and *Blakely* since it imposed a standard of reasonableness); *State v. Gomez*, 163 S.W.3d 632, 661-662 (Tenn. 2005); *see also State v. Maugaotega*, 114 P.3d 905, 916 (Haw. 2005). Many panels of a "sharply divided" California Court of Appeal, and subsequently the California Supreme Court itself, also found California's procedure constitutional, analogizing it to the system of reasonableness approved in the *Booker* remedial opinion. *See People v. Black*, 35 Cal. 4th at 1253; *id.* at 1244, 1259. The large number of jurists finding that California's upper term sentencing scheme and similar statutes did not violate the Sixth Amendment demonstrates that the outcome in *Cunningham* was not so clear that no reasonable jurist could have reached a contrary result. *See Cruz*, 423 F.3d at 1120; *Schardt*, 414 F.3d at 1035; *see also Lambrix v. Singletary*, 520 U.S. 518 (1997) (the capital case of *Espinosa v. Florida*, 505 U.S. 1079 (1992), holding that the judge and jury in a weighing state may not weigh invalid aggravating circumstances, is a new rule because reasonable jurists could have reached a different outcome based on different approaches to prior precedent).

Thus, in light of the legal landscape at the time Petitioner's conviction became final on April 4, 2006, reasonable jurists would not have felt compelled to reach the same conclusion as *Cunningham*. Even though the Supreme Court has now clarified that California's upper term sentencing violates the Sixth Amendment, granting relief to Petitioner would require retroactive application of a new rule under *Teague*.

The third and final inquiry is whether the new rule falls into one of *Teague's* exceptions,

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

41

1   under which a new rule may be given retroactive effect on collateral review.  The first exception is

2   inapplicable because the rule announced in *Cunningham* does not place conduct beyond the reach

3   of criminal law or "decriminalize" any class of conduct.  *See Saffle v. Parks*, 494 U.S. 484, 495

4   (1990).  The *Cunningham* rule also is not a "watershed exception" because, as the Ninth Circuit put

5   it, "we cannot confidently say that judicial factfinding seriously diminishes accuracy." *See Schardt*,

6   414 F.3d at 1036 (*Blakely* does not satisfy the watershed-rule exception to *Teague*).

7       Because the rule announced by *Cunningham* is "new" within the meaning of *Teague* and

8   does not fall into one of *Teague's* exceptions, federal habeas relief is barred in this case.

9   **E.    The Court Of Appeal Did Not Unreasonably Apply Supreme Court Precedent**
          **In Denying Petitioner's Claim**

10

11      The state appellate court's conclusion that California's upper term procedure was

12  constitutional was not an unreasonable application of Supreme Court precedent.  28 U.S.C. §

13  2254(d).

14      As noted above, the outcome in *Cunningham* was not a foregone conclusion.  Rather,

15  many courts agreed with the California Supreme Court in finding that an upper term sentencing

16  scheme like that in California was constitutional.  Indeed, three justices of the Supreme Court

17  ultimately concluded that California's sentencing scheme was constitutional. *Cunningham*, 127 S.

18  Ct. at 873 (Alito, J., dissenting).  *Apprendi*, *Blakely*, and *Booker*, clearly established that a

19  defendant's right to jury trial prohibited imposing a sentence above an initial sentencing range based

20  on facts not found by the jury.  But they did not clearly establish that California's upper term

21  sentencing system, which required that a sentencing choice within an initial range be reasonable,

22  necessarily violated those tenets.  Therefore, the California courts' rejection of petitioner's claim was

23  not an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. 2254(d).

24

25  **F.    No Substantial Or Injurious Effect Is Shown**

26      Moreover, petitioner has failed to show the alleged error had a substantial and injurious

27  effect or influence in determining the jury's verdict.  *See Fry*, 127 S. Ct. at 2328.  The Supreme

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

42

1  Court has held that a *Blakely*-type error in failing to submit an aggravating circumstance to a jury

2  is subject to harmless error analysis. *Washington v. Recuenco*, ___ U.S. ___, 126 S. Ct. 2546, 2553

3  (2006).

4          Any error in this case was harmless if the jury would have found at least one of the

5  aggravating circumstances true beyond a reasonable doubt.  This is because *Cunningham* error only

6  occurs if the jury did not find the necessary fact that authorizes the imposition of, or makes the

7  defendant eligible for, the increased sentence.  In California, a single aggravating factor is sufficient

8  to render a defendant eligible for the upper term.  *People v. Osband*, 13 Cal. 4th 622, 728 (1996);

9  *see also People v. Black*, 35 Cal. 4th at 1255 (California Penal Code section 1170(b) mandates "that

10  the middle term be imposed unless an aggravating factor is found").  Thus, the presence of a single

11  circumstance in aggravation provides the trial court with the statutory authority to impose the upper

12  term, irrespective of the particular term the court ultimately imposes after conducting the requisite

13  balancing.  *See generally Cunningham*, 127 S. Ct. at 865 (the constitutional test focuses on the

14  judge's "authority" to impose enhanced sentence).  Since a single aggravating circumstance is

15  sufficient to authorize the imposition of the upper term sentence under state law, a determination that

16  the jury would have found at least one aggravating circumstance true beyond a reasonable doubt

17  necessarily renders the *Cunningham* error harmless.

18          Here, any error was harmless since the trial court's reasons for imposing the upper term

19  were observations drawn from largely uncontested or overwhelming evidence. LaBonte's face was

20  gratuitously struck with a rifle butt, breaking his jaw, and causing severe damage to his ear and

21  teeth.  Worcester was shot in the back three times even though he did not resist his assailants,

22  resulting in his death.  Given this undisputed evidence, there is no doubt the jury would have found

23  that the robbery of Worcester and the robbery and assault of LaBonte involved great violence and

24  bodily harm.  In addition, there is no doubt the jury would have found that the crimes were planned,

25  given that two of petitioner's accomplices testified that they drove around purposefully looking for

26  someone to rob.  There is also no doubt that the jury would have found that petitioner was a serious

27  danger to society, given that he actively participated in the crimes and showed total disregard for

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

1   other human beings.  The upper term would have been authorized based on any of these factors.

2   Therefore, any error was harmless.  *Fry*, 127 S. Ct. at 2328.[9/]

3

4                                              **VIII.**

5       **PETITIONER'S FAILURE TO ESTABLISH A SINGLE INSTANCE OF
        CONSTITUTIONAL   ERROR   UNDERMINES   HIS   CUMULATIVE**
6       **ERROR CLAIM**

7                Finally, petitioner argues that the effect of cumulative errors at trial violated his right to

8   due process.   As demonstrated above, however, petitioner has failed to establish any federal

9   constitutional violation arising from his individual claims of error.   Accordingly, his cumulative

10  error claim necessarily fails.  *See United States v. Gutierrez*, 995 F.2d 169, 173 (9th Cir. 1993)

11  (where no error exists, by extension, cumulative error argument fails).

12  ///

13  ///

14  ///

15  ///

16

17

18

19

20

21

22

23

24

25

26  _____

27        9.  The sentence on counts two, three, and four had little practical effect, as petitioner was
    sentenced to life without possibility of parole on the murder count.

28

    Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus        Mooring v. Walker
                                                                                         C 07-5013 SI (pr)

                                              44

1

**CONCLUSION**

2    Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

3 be denied.

4    Dated:  March 13, 2008

5                    Respectfully submitted,

6                    EDMUND G. BROWN JR.
                     Attorney General of the State of California

7                    DANE R. GILLETTE
                     Chief Assistant Attorney General

8
                     GERALD A. ENGLER
9                    Senior Assistant Attorney General

                     PEGGY S. RUFFRA
10                   Supervising Deputy Attorney General

11
                     /s/ Michele J. Swanson
12                   MICHELE J. SWANSON
                     Deputy Attorney General

13                   Attorneys for Respondent

14
    40219860.wpd
15  SF2007403156

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus            Mooring v. Walker
                                                                                              C 07-5013 SI (pr)

45

1

**TABLE OF CONTENTS**

2
**Page**

3    STATEMENT OF THE CASE                                                    1

4    STATEMENT OF FACTS                                                       2

5    ARGUMENT                                                                 9

6    I.      STANDARD OF REVIEW GOVERNING FEDERAL HABEAS
             PETITIONS BROUGHT BY STATE PRISONERS                             9
7
8    II.     THE ADMISSION OF EVIDENCE OF A SUBSEQUENT
             ROBBERY COMMITTED BY PETITIONER AND HIS
             STATEMENT TO THE POLICE AFTERWARD DID NOT
9            VIOLATE DUE PROCESS                                             10

10           A.    Trial Court Proceedings                                   10

11           B.    California Court Of Appeal Opinion                        14

12                 1.    Evidence Of McCready Incident                       14

13                 2.    Evidence Of Petitioner's Statement To The Police    15

14           C.    The Court Of Appeal's Decision Did Not Constitute An Unreasonable
                   Application Of Supreme Court Law                          16
15
16                 1.    Standard For Reviewing Evidentiary Claims On Federal Habeas   16

17                 2.    Evidence Of McCready Incident                       16

18                 3.    Evidence Of Petitioner's Statement To The Police    17

19   III.    THE INADVERTENT ADMISSION OF HEARSAY THAT WAS
             IMMEDIATELY STRICKEN FROM THE RECORD DID NOT
20           VIOLATE PETITIONER'S CONFRONTATION RIGHTS
             UNDER *CRAWFORD*                                                19
21
             A.    Trial Court Proceedings                                   19
22
             B.    California Court Of Appeal Opinion                        23
23
             C.    The Court Of Appeal's Determination That *Crawford* Did Not Apply
                   Was Not Objectively Unreasonable                          24
24
25   IV.     THE PROSECUTOR'S FAILURE TO DISCLOSE A POLICE
             REPORT SUMMARIZING AN AUDIOTAPED INTERVIEW
26           WITH ONE OF THE PROSECUTION WITNESSES DID NOT
             VIOLATE *BRADY*                                                 26
27
             A.    Trial Court Proceedings                                   26
28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                         C 07-5013 SI (pr)

i

## TABLE OF CONTENTS  (continued)

**Page**

B.   California Court Of Appeal Opinion ........................... 27

C.   The Court Of Appeal Reasonably Applied *Brady* And Concluded That Petitioner Was Not Prejudiced By The Prosecutor's Failure To Disclose Sergeant Ridgeway's Report ........................... 28

V.   THE FAILURE TO REQUIRE JURY UNANIMITY ON AN UNDERLYING THEORY OF GUILT DOES NOT VIOLATE THE SIXTH OR FOURTEENTH AMENDMENT ........................... 29

A.   Trial Court Proceedings ........................... 30

B.   California Court Of Appeal Opinion ........................... 31

C.   The Court Of Appeal Reasonably Followed *Schad* In Rejecting Petitioner's Unanimity Claim ........................... 32

VI.   THE ADMISSION OF A PHOTOGRAPH OF THE VICTIM WHILE ALIVE DID NOT VIOLATE DUE PROCESS ........................... 32

A.   Trial Court Proceedings ........................... 33

B.   California Court Of Appeal Opinion ........................... 34

C.   The Court Of Appeal Reasonably Concluded That The Photograph Had Probative Value And Was Not Prejudicial ........................... 34

VII.   PETITIONER'S *BLAKELY* CLAIM IS FORECLOSED BY *TEAGUE*; MOREOVER, THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM, AND ANY ERROR WAS HARMLESS ........................... 35

A.   Trial Court Proceedings ........................... 35

B.   California Court Of Appeal Opinion ........................... 36

C.   The *Cunningham* Decision ........................... 36

D.   Granting Relief Under *Cunningham* Or *Blakely* Would Violate *Teague* ........................... 37

E.   The Court Of Appeal Did Not Unreasonably Apply Supreme Court Precedent In Denying Petitioner's Claim ........................... 42

F.   No Substantial Or Injurious Effect Is Shown ........................... 42

VIII.   PETITIONER'S FAILURE TO ESTABLISH A SINGLE INSTANCE OF CONSTITUTIONAL ERROR UNDERMINES HIS CUMULATIVE ERROR CLAIM ........................... 44

CONCLUSION ........................... 45

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

ii

1

# TABLE OF AUTHORITIES

2
                                                                        **Page**

3  **Cases**

4  *Aguilar v. Alexander*
   125 F.3d 815 (9th Cir. 1997)                                            25
5
   *Apprendi v. New Jersey*
6  530 U.S. 466 (2000)                                    30-32, 36, 39, 40, 42

7  *Arizona v. Roberson*
   486 U.S. 675 (1988)                                                     38
8
   *Arredondo v. Ortiz*
9  365 F.3d 778 (9th Cir. 2004)                                            37

10 *Beard v. Banks*
   542 U.S. 406 (2004)                                                     37
11
   *Blakely v. Washington*
12 542 U.S. 296 (2004)                                        29, 31, 32, 35-42

13 *Bowen v. Roe*
   188 F.3d 1157 (9th Cir. 1999)                                           37
14
   *Brady v. Maryland*
15 373 U.S. 83 (1963)                                              26, 28, 29

16 *Butler v. McKellar*
   494 U.S. 407 (1990)                                                     38
17
   *Caspari v. Bohlen*
18 510 U.S. 383 (1994)                                                     37

19 *Clay v. Bowersox*
   367 F.3d 993 (8th Cir. 2004)                                            29
20
   *Cooper-Smith v. Palmateer*
21 397 F.3d 1236 (9th Cir. 2005)                                           39

22 *Crawford v. Washington*
   541 U.S. 36 (2004)                                               19, 23, 24
23
   *Cunningham v. California*
24 ___ U.S. ___, 127 S. Ct. 856 (2007)                                  35-43

25 *Dubria v. Smith*
   224 F.3d 995 (9th Cir. 2000)                                            17
26
   *Edwards v. Lamarque*
27 475 F.3d 1121 (9th Cir. 2007)                                           10

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                        C 07-5013 SI (pr)

iii

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Espinosa v. Florida*
505 U.S. 1079 (1992)                                                                      41

*Estelle v. McGuire*
502 U.S. 62 (1991)                                                                        24

*Evanchyk v. Stewart*
340 F.3d 933, 937 n.1 (9th Cir. 2003)                                                     32

*Fry v. Pliler*
127 S. Ct. 2321 (2007)                                                   17, 18, 25, 29, 42

*Graham v. Collins*
506 U.S. 461 (1993)                                                                       38

*Greer v. Miller*
483 U.S. 756, 766 n.8 (1987)                                                              25

*Hamilton v. Vasquez*
17 F.3d 1149 (9th Cir. 1994)                                                              17

*Hayes v. Brown*
399 F.3d 972 (9th Cir. 2005)                                                              37

*Jammal v. Van de Kamp*
926 F.2d 918 (9th Cir. 1991)                                                  16, 25, 34, 35

*Johnson v. Texas*
509 U.S. 350 (1993)                                                                       38

*Lambrix v. Singletary*
520 U.S. 518 (1997)                                                                       41

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                                                         9

*Miller-El v. Dretke*
545 U.S. 231 (2005)                                                                       10

*O'Dell v. Netherland*
521 U.S. 151 (1997)                                                                    38, 40

*People v. Black*
35 Cal. 4th 1238 (2005)                                                            36, 41, 43

*People v. Culuko*
78 Cal. App. 4th 307 (2000)                                                            30, 31

*People v. Osband*
13 Cal. 4th 622 (1996)                                                                    42

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                       C 07-5013 SI (pr)

iv

**TABLE OF AUTHORITIES  (continued)**

Page

*People v. Steele*
27 Cal. 4th 1230 (2002) ..... 10

*Plascencia v. Alameida*
467 F.3d 1190 (9th Cir. 2006) ..... 35

*Ring v. Arizona*
536 U.S. 584 (2002) ..... 29, 31, 32, 40

*Romano v. Oklahoma*
512 U.S. 1 (1994) ..... 16, 17, 25, 34, 35

*Saffle v. Parks*
494 U.S. 484 (1990) ..... 41

*Schad v. Arizona*
501 U.S. 624 (1991) ..... 30-32

*Schardt v. Payne*
414 F.3d 1025 (9th Cir. 2005) ..... 39, 41

*Schriro v. Summerlin*
542 U.S. 348, 353-358 (2004) ..... 40

*Shabazz v. Artuz*
336 F.3d 154 (2d Cir. 2003) ..... 29

*Simental v. Matrisciano*
363 F.3d 607 (7th Cir. 2004) ..... 29

*Simmons v. South Carolina*
512 U.S. 154 (1994) ..... 38, 40

*Skipper v. South Carolina*
476 U.S. 1 (1986) ..... 38

*Spencer v. Texas*
385 U.S. 554 (1967) ..... 16

*State v. Gomez*
163 S.W.3d 632 (Tenn. 2005) ..... 41

*State v. Lopez*
123 P.3d 754 (N.M. 2005) ..... 41

*State v. Maugaotega*
114 P.3d 905 (Haw. 2005) ..... 41

*Strickler v. Greene*
527 U.S. 263 (1999) ..... 28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
C 07-5013 SI (pr)

v

## TABLE OF AUTHORITIES  (continued)

**Page**

*Tankleff v. Senkowski*
135 F.3d 235 (2d Cir. 1998)                                              29

*Teague v. Lane*
489 U.S. 288 (1989)                                        35, 37-39, 41, 42

*United States v. Avellino*
136 F.3d 249 (2d Cir. 1998)                                             29

*United States v. Booker*
543 U.S. 220 (2005)                                              36, 39-42

*United States v. Cruz*
423 F.3d 1119 (9th Cir. 2005)                                        39-41

*United States v. Gutierrez*
995 F.2d 169 (9th Cir. 1993)                                            44

*United States v. Prior*
546 F.2d 1254 (5th Cir. 1977)                                          29

*Washington v. Recuenco*
___ U.S. ___, 126 S. Ct. 2546, 2553 (2006)                             42

*Williams v. Stewart*
441 F.3d 1030 (9th Cir. 2006)                                          16

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                   9, 10

**Constitutional Provisions**

United States Constitution
        Fourteenth Amendment                                         29, 36
        Sixth Amendment                                       29, 32, 36, 41

**Statutes**

United States Code, Title 28
        § 2254(d)                                                        42
        § 2254(d)(1)                                                      9

California Evidence Code
        § 1101, subd. (b)                                                10

California Penal Code
        § 1170(b)                                                     36, 43

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                      C 07-5013 SI (pr)

vi

**TABLE OF AUTHORITIES  (continued)**

**Page**

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996                    9, 37

CALJIC
         No. 2.50                                                        14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo. of Pts. and Auths. In Support of Answer to Pet. for Writ of Hab. Corpus          Mooring v. Walker
                                                                                       C 07-5013 SI (pr)

vii